Petition of S. C. LOVELAND CO., Inc., a corporation, in exoneration from or limitation of liability as late owner and operator of THE barge FELL LOVELAND.

No. 117 of 1955.

United States District Court
E. D. Pennsylvania.

Feb. 17, 1959.

Benjamin F. Stahl, Jr., and George H. McNeely, III, Philadelphia, Pa., for petitioner.

George E. Beechwood and J. Paul Erwin, Jr., Philadelphia, Pa., for Florence Pipe Foundry & Machine Co.

William Bruno, Philadelphia, Pa., for Quaker City Nav. Co.

VAN DUSEN, District Judge.

### I. History of the Case

The Petition of S. C. Loveland Co., Inc., in exoneration from, or limitation of, liability as late owner and operator of the barge Fell Loveland, was filed in this court on April 15, 1955. Subsequently, answers and claims were filed by three parties, who withdrew their claims prior to November 1958,[1] at which time the petitioner asked the trial judge to proceed with decision in the case as to the remaining claimants because of inability to reach a settlement with them. In November and December 1958, Requests for Findings of Fact and Conclusions of Law were filed on behalf of the petitioner and the following claimants, who are the only three parties continuing as parties to this proceeding:

A. Florence Pipe Foundry and Machine Co. (hereinafter called "Florence"), the owner of the pig iron loaded aboard the barge Fell Loveland at the time she sank (see Answer of Florence filed 6/15/55 as Document No. 5 in Clerk's file and Claim of Florence filed the same day as Document No. 6 in Clerk's file).

B. Quaker City Navigation Co. (hereinafter called "Quaker"), claiming that it was unable to discharge its car-

---

[1]. Philadelphia Electric Company filed its Answer and Claim on 6/16/55 (Documents Nos. 7 and 8 in Clerk's file). On January 16, 1956, Philadelphia Electric Company filed an order to mark its damage claim "withdrawn without prejudice" (Document No. 17 in Clerk's file). Emily F. James, widow of Joseph C. James, deceased (the barge captain), filed her Answer and Claim on June 16, 1955 (Documents Nos. 9 and 10 in Clerk's file). On the first day of the trial of the case, counsel for petitioner announced that this claim had been settled (N. T. 3; see, also, Document No. 22 in Clerk's file). Chester Blast Furnace, Inc. (hereinafter called "Chester") filed its Answer and Claim on June 17, 1955 (Documents Nos. 14 and 13, respectively, in the Clerk's file). On October 8, 1958, Chester filed an order to mark its claim "withdrawn with prejudice" (Document No. 25 in Clerk's file).

goes of coke at the pier due to the obstruction of the sunken barge (see Answer of Quaker filed 6/17/55 as Document No. 12 in Clerk's file and Claim of Quaker filed the same day as Document No. 11 in Clerk's file).[2]

The trial of the case was held in February 1958. At the beginning of the trial, it was agreed that the issue of the amount of damages would be "reserved and passed on to a Commissioner" (N. T. 5 & 6). After the testimony was transcribed, counsel for Chester and counsel for petitioner asked the trial judge for more time to file their Requests for Findings of Fact and Conclusions of Law since "some headway was being made toward settlement of the issues."[3] It proved impossible for petitioner to reach a settlement with Florence and Quaker and the above-mentioned Requests, together with supporting briefs, were filed in the last two months of 1958. Oral argument was heard on December 29, 1958.

The restraining order filed April 14, 1955, as amended May 14, 1956, will be further amended in accordance with the terms of Admiralty Rule 51 to make clear that it does not bar the institution of S. C. Loveland Co., Inc., etc., v. Florence Pipe Foundry & Machine Co., No. 59 of 1958 in Admiralty, as suggested at pages 8 and 9 of the brief filed by petitioner in that action on December 24, 1958.

## II. Findings of Fact

1. All the requested Findings of Fact of petitioner, with the following four modifications, are adopted as Findings of Fact of the trial judge:

(a) There is added at the end of paragraph 3: "(This sentence is amplified and qualified by Finding of Fact 5 of the trial judge.)"

(b) Sub-paragraph 5(e) is reworded as follows: "All claims for loss and/or damage and/or expense against petitioner were waived by Florence 'except for General Average, Sue and Labor and Collision Liability' (see paragraph 10)." (See Exhibit L–3.)

(c) Paragraph 7 is modified by inserting at the beginning of the sentence "On the night of March 11, 1955" and by deleting the first word, "and," in the second line.

(d) Paragraph 8 is modified by adding at its end the words "for carriage of 1000 tons of pig iron from Chester, Pa., to Florence, New Jersey."

2. All the requested Findings of Fact of Florence Pipe Foundry and Machine Co. (hereinafter called "Florence"), except for paragraphs 5, 6, and 8, and with the following added at the end of paragraph 3, are adopted as Findings of Fact of the trial judge: "(This sentence is amplified and qualified by Finding of Fact 5 of the trial judge.)"

3. Subsequent to World War II, the barge Fell Loveland was converted[4] for use solely on the inland waterways, since it became uneconomical to operate barges of her size in the coastwise trade.

4. The Fell Loveland carried the following loads in excess of 1000 tons between Chester, Pa., and Florence, N. J.,

2. On December 5, 1958, counsel for Quaker notified the secretary of the trial judge that he was willing to rest his position on the brief and the Requests for Findings of Fact and Conclusions of Law of Florence. At the time of the oral argument on December 29, 1958, counsel for Quaker again notified the law clerk of the trial judge that he was willing to rely on the brief, Requests, and oral argument of Florence. See copy of letter from the law clerk of the trial judge to counsel for Quaker dated January 12, 1959, which is attached hereto.

3. See letters of June 26, June 27, and June 30, 1958, summarizing the status of the matter at that time. The above quotation summarizes a brief discussion in court and is found in the first paragraph of the letter of June 26, 1958.

4. The rudder and part of the barge's quarters were removed and the crew was reduced from three to one. This was the last barge of this size operated by petitioner in the coastwise trade and it was removed from this trade about December 1947 (N. T. 34–35).

prior to March 10, 1955, and petitioner's accountant had records showing that it was paid freight on the basis of these loads (Exhibits L-37 and L-32):

| Weight In Gross Tons | Date of Shipment (L-37) | Date Bill Sent To Petitioner by Florence (L-32) |
|---|---|---|
| 1012–1015 | November 30, 1954 | December 13, 1954 |
| 1016–1020 | December 29, 1954 | January 7, 1955 |
| 1017–1022 | January 6, 1955 | January 14, 1955 |
| 1022–1024 | January 13, 1955 | January 21, 1955 |
| 1079–1082 | February 14, 1955 | February 21, 1955 |
| 1066–1071 | February 19, 1955 | February 28, 1955 |
| 1061–1069 | February 25, 1955 | March 7, 1955 |

The president of petitioner did not know that the barge had carried in excess of 1000 tons on any of these loads prior to the sinking of the Fell Loveland (N.T. 41).

5. Barge Captain James' duties included properly maintaining the barge (N.T. 34), checking the barge for water (N.T. 190), taking care that the barge was loaded in such a way that it would not be damaged or unnecessarily strained (N.T. 66, 189, and Answer to Interrogatory 18 in C.P. 3, Sept. Term 1955, No. 5003), but it was not his duty to determine the size of the load the barge was to carry (N.T. 192). Once, in February 1955, petitioner's marine superintendent cautioned James about not putting too much weight in the barge (N.T. 195, 199, 267).[5]

6. James had the opportunity to call the marine superintendent or president of petitioner for instructions concerning the removal of the alleged extra carload of pig iron on the barge on the evening of March 11, 1958.

7. It was not possible to use the pier at which the Fell Loveland had been moored from March 12, 1955, when it sank, until the remains of the sunken barge were removed in June 1955.

8. Petitioner only decided to abandon the barge at the pier when they learned that the cost of salvaging it would be in excess of $25,000 and Chester would not "split * * * the expense with us of raising the barge" (N.T. 27–28).

9. There is no evidence that petitioner believed or knew that Quaker was doing business regularly at the above-mentioned pier or that it had any contract with Chester or any other person involving the use of this pier.

III. Discussion

This is a petition of a barge owner in exoneration from, or limitation of, liability. Since the facts are set forth in the foregoing Findings, it is unnecessary to review here the circumstances surrounding the sinking of the barge Fell Loveland during the early morning of March 12, 1955, while tied to a pier in the Delaware River at Chester, Pa.[6] There are attached to these History, Findings, Discussion and Conclusions

5. Another employee of the petitioner, who did some of the repair work on petitioner's barges, told James on two occasions, which were at least six months prior to March 12, 1955, when the barge sank, that he "thought (James) was putting her down pretty deep" (N. T. 242). However, this employee had no authority to advise James on petitioner's behalf on the proper freeboard for any barges. Petitioner's marine superintendent testified that a 12-inch freeboard was enough for this "run up the river" in view of the 10-inch hatch combing on this barge (N. T. 196).

6. The body of the barge captain (James) was subsequently found in the cargo hold of the barge.

the briefs of petitioner and of claimant Florence because of their helpful references to the testimony. Particular reference is made to the analysis of the testimony concerning repairs and maintenance and of certain expert witnesses at pages 11 to 17 of the petitioner's brief with which the trial judge agrees.[7]

A. Petitioner is not entitled to exoneration because of the negligence of the barge captain.

■ The barge captain (James) was negligent in not requiring the employees of Chester to remove the excess pig iron from the barge on the night of March 11, 1955, as well as in not notifying one of the superior officials of his company of the situation to secure their advice.[8] The trial judge finds that this overloading was the cause of the barge's sinking.[9] Even though James was only told that there was one extra carload of pig iron on the barge, whereas there were at least two such extra carloads on the barge,[10] he had been cautioned by the marine superintendent the previous month that he should not put too much weight in the barge and, in the exercise of due care, he should have realized that the 1144-ton load was substantially (14%) heavier than the approved maximum load of approximately 1000 tons.[11]

B. Petitioner is entitled to limitation under 46 U.S.C.A. § 183(a).

■ The facts that petitioner's marine superintendent had given petitioner a general warning about overloading the barge after the first February trip and that subsequently petitioner's accounting department received a statement dated February 28, 1955, showing that about 1070 tons had been loaded on the barge for the second February 1955 trip,[12] do not amount to knowledge that

---

7. For example, the trial judge cannot agree with Mr. Wells' conclusion that "the condition of (certain) rivets * * were in no way affected by the salvage operation" (p. 39, Deposition, Document No. 26 in Clerk's file). Mr. Holm Anderson testified that the cutting up of the sunken barge's hull with the "I" beam could "start" non-leaking rivets, as well as a seam or a lap. He also admitted that rivets and laps could have been damaged by the strain of pulling the portions of the barge's hull out of the water and muddy river bottom. See, also, Mr. Wells' testimony that he found no holes in the bottom side or bilge plating (Deposition, 41). It is noted that the typing on the pictures was placed there by Mr. Wells.

8. See Answer to Interrogatory 18 (C. P. 3, Sept. Term 1955, No. 5003).

9. The trial judge believes that the barge was seaworthy for trips on the Delaware River with loads of · 1000 gross tons or less, but it is noted that Clause 7 of the Contract provides that "* * * The owner does not by implication, or otherwise, warrant the seaworthiness of the vessel * * *."

10. 1144 or 1145 tons were loaded on the barge and each freight car carried about 60 tons (N. T. 558 and 602; see, also, L–38a and L–38b).

11. See Findings of Fact 4 and 5 and Answers to Interrogatories 14 and 17 (C.

P. 3, Sept. Term 1955, No. 5003). Mr. Leedom testified as follows (N. T. 267):
"* * * Captain Tieder (marine superintendent of petitioner) advised me by telephone covering the first voyage in February of 1955 when the vessel was docked, presumably at his pier at Philadelphia en route to Florence, that he had taken the question up with the captain, and presumably that it would be rectified in the future; in other words, that there would be no excess loading."
Also, James was familiar with the freeboard of his barge on the trips with about 1070 tons and there is every reason to believe that he must have noticed the freeboard was less with 1144 tons aboard when he made his inspection with Mr. Cooke (N. T. 498). Mr. Cooke and Mr. Nolan testified that, at 8 P.M. and 10 P.M. on March 11, there was only a foot between the river and the deck of the barge (N. T. 487, 494, 538–9), and the trial judge believes that the freeboard at the center of the barge was less than this amount. The freeboard with a load of 1000 tons was approximately one foot, 9 inches, and the freeboard with a load of 1145 tons would have been approximately 6⅝ inches. See Answer to Interrogatory 22 (C. P. 3, Sept. Term 1955, No. 5003).

12. The bill for the third February 1955 trip was not sent out until March 7 (L–32) and would not have arrived at peti-

1144 tons were likely to be loaded on the barge. If petitioner is to be charged with the knowledge of the loads as shown on the statements in its accounting department, it knew that the Fell Loveland had successfully carried seven loads ranging from 1012 tons to 1082 tons each between November 30, 1955, and March 7, 1956, but there was no suggestion that an 1145-ton load would be carried.

After considering (1) the testimony of petitioner's marine superintendent that a 12-inch freeboard was enough for this "run up the river," in view of the 10-inch hatch combing on the barge (N. T. 196), and (2) the successful carriage of the seven previous loads varying from 1015 to 1082 tons on this "run," [13] the trial judge does not believe the reasoning in In re Petition of American Dredging Co., D.C.E.D.Pa.1956, 141 F.Supp. 582, 586, affirmed, 3 Cir., 1956, 235 F.2d 618, reversed on other grounds Kernan v. American Dredging Co., 1958, 355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382, relied on by Florence, is applicable to the facts of this case. On the present record, the trial judge (recognizing that petitioner has the burden of persuasion on its right to limitation, as well as the burden to come forward with evidence to explain the sinking) does not believe that a finding of continued dangerous overloading of the barge after the cautionary instruction, but prior to March 10, 1955, is justified. There is every

reason to believe that the barge could carry 1070 tons safely, but that the extra 75 tons were enough to dangerously overload it.

The trial judge has found no evidence in the record supporting Florence's claim (page 5 of its brief) that James "made no effort to pump the bilges." James is entitled to the presumption of due care applicable to a decedent.

The trial judge concludes that the loss and damages to the cargo were "without the privity or knowledge of" petitioner, which is entitled to limitation of liability under the terms of 46 U.S.C.A. §§ 183 (a) and 188.

C. Florence is entitled to such damages as may be found to fall under the terms "General Average" and "Sue and Labor."

█ In this suit, it is not necessary to decide what obligations Florence may have to petitioner arising out of Clauses 1 and 2 of the Contract.[14] It is clear that petitioner is responsible for the negligence of James, and Florence expressly reserved in the contract claims "for General Average, Sue and Labor." [15]

The trial judge finds that Florence was not contributorily negligent in receiving the two cargoes of over 1060 tons shipped on February 19 and February 25, 1955, without further complaint for the reasons stated above in the first paragraph under B. Any negligence of Ches-

---

tioner's office until after the Fell Loveland left for Chester on this last fatal voyage, for what was to have been the first trip under the March 1, 1955, contract (L–3).

13. See Finding of Fact 4.

14. The provision in the Charter Party (Exhibit L–3) that Florence is to "load, stow, (and) trim" cargo entirely at its "expense and *risk*" (emphasis supplied), is no defense to a suit for loss or damage arising from negligence. Cf. Bisso v. Inland Waterways Corp., 1955, 349 U.S. 85, 90–91, 75 S.Ct. 629, 99 L.Ed. 911; Prosser on Torts (2nd Ed. 1955), pp. 305–7. However, it is not necessary here to determine whether or not petitioner would have a contract right of action against Florence (see S. C. Love-

land Co., Inc., etc., v. Florence, etc., No. 59 of 1958 in Admiralty). See, also, O'Brien Bros. v. City of New York, 2 Cir., 1926, 9 F.2d 542; Conners-Standard Marine Corp. v. Marine Fuel Transfer Corp., D.C.E.D.N.Y.1955, 135 F.Supp. 365; cf. The Moran No. 10, D.C.S.D.N.Y.1924, 41 F.2d 255.

15. Clause 10 of the contract (L–3) provides:
"All claims for loss and/or damage and/or expense of whatsoever nature or from what ever cause * * * against (petitioner) * * * are hereby waived, except for General Average, Sue and Labor and Collision Liability."
For authorities on the phrase "Sue and Labor", see petitioner's letter of 12/30/58, which is attached hereto.

ter in overloading the barge and telling James that one, rather than two, extra cars had been loaded cannot be imputed to Florence, which had advised Chester that the loads should not exceed approximately 1000 tons (N.T. 265–6).

### D. The claim of Quaker must be dismissed on this record.

■■ Quaker's claim alleges a deprivation of "* * * its contractual rights with Chester Blast Furnace, Inc. whereby claimant would have been netting each month $7,500 for the discharge of coke there (at the pier where the barge sank on March 12) * * *."[16] No evidence was offered to show that Quaker had any contract for future deliveries but, even if this is assumed, there was no allegation or proof that petitioner knew of any such contract. Furthermore, there is no evidence that the sinking of the barge was intentional (see Findings of Fact 8 and 9). Under these circumstances, Quaker's claim must be dismissed.

The law has consistently recognized that negligence (as opposed to intentional conduct) which results in interference with the contract right of another is no basis for a cause of action for damages where the negligent party has no belief or knowledge of the existence of such contract right. See Restatement of Torts, § 766, comment d,[17] and § 870, comment e; Robins Dry Dock & Repair Co. v. Flint, 1927, 275 U.S. 303, 308–309, 48 S.Ct. 134, 72 L.Ed. 290; Borcich v. Ancich, 9 Cir., 1951, 191 F.2d 392, 397–398; cf. Sweeney v. Smith, C.C.E.D.Pa. 1909, 167 F. 385, affirmed, 3 Cir., 1909, 171 F. 645; certiorari denied, 1909, 215 U.S. 600, 30 S.Ct. 400, 54 L.Ed. 343.

In Donovan Construction Co. v. General Electric Co., D.C.Minn.1955, 133 F. Supp. 870, 874, the court said:

"Mere negligence in interfering with another's contract rights will not sustain the cause of action for damages * * *. There are a multitude of cases which sustain the principle that, as an indispensable condition precedent to liability for interference with the performance of one's contract, there not only must be knowledge of the contract, but there must be an intentional interference therewith."

### IV. Conclusions of Law

1. This court has jurisdiction of the subject matter of this cause and the parties.

2. The petitioner, S. C. Loveland Company, Inc., as owner and operator of the barge Fell Loveland, is not entitled to exoneration from liability.

3. Petitioner is entitled to limitation of liability under 46 U.S.C.A. § 183(a).

4. Quaker City Navigation Company failed to establish a cause of action against petitioner.

5. Florence Pipe Foundry and Machine Company is entitled to recover from the S. C. Loveland Company, Inc., its damages, if any, covered by the contract language "General Average" and "Sue and Labor" and caused by the negligence on behalf of James.

■ 6. Petitioner is entitled to recover the approximate costs against Quaker City Navigation Company within the rule of The W. A. Sherman, 2 Cir., 1909, 167 F. 976, 977.[18]

---

16. Paragraph 2 of Quaker's Claim (Document No. 11 in Clerk's file). Quaker also claimed in this paragraph damages for costs of mooring and maintenance of vessel and loss of insurance premiums, but no evidence in support of any items of this claim was offered at the trial.

17. This comment contains this language at page 55: "* * * The essential thing is the purpose to cause the result. If the actor does not have this purpose,

his conduct does not subject him to liability under this rule even if it has the unintended effect of deterring the third person from dealing with the other * * *."

18. In this case the court said at page 977: "If any issue is contested in the proceeding between the petitioner and the claimants or any claimant, the costs should fall as usual upon the losing party. They are such as witness fees, mile-

7. Florence Pipe Foundry and Machine Company is entitled to recover its costs against S. C. Loveland Company, Inc.

Petitioner shall submit promptly a decree in accordance with the terms of the last paragraph under I above.

age, deposition fees, proctor's fee. The cost of bringing in the creditors, such as filing, issuing, and publishing the monition, should be paid out of the fund, on the principle that it should administer itself, and this duty to administer itself applies even when, the petitioner being held not liable, there is no other distribution than to return it to him."