In the matter of the complaint of **LYRA SHIPPING COMPANY, LTD.**, as owner of the M/S **GALAXY FAITH**, for Exoneration from, or Limitation of Liability.

Civ. A. Nos. 72–1010, 72–973, 72–992 and 72–1215.

United States District Court,
E. D. Louisiana,
Section "E".

July 2, 1973.

Clarence Frost, Faris, Ellis, Cutrone, Gilmore & Lautenschlaeger, New Orleans, La., for Lyra Shipping Co., Ltd.

Joe L. Horne, New Orleans, La., for Tex-Barge, Inc. and Marine Tow, Inc.

F. A. Courtenay, Jr., Leach, Grossel-Rossi & Paysse, New Orleans, La., for Magnolia Marine Transport Co.

James G. Burke, Jr., Burke & Ballard, New Orleans, La., for Cabot Corp.

## ON MOTION FOR SUMMARY JUDGMENT

CASSIBRY, District Judge.

These cases grow out of the collision involving the GALAXY FAITH that occurred in the Inner Harbor Navigational Canal Locks. The defendant seeks to have the claims of various parties dismissed.

## I. NATURE OF THE DAMAGES CLAIMED.

The damages claimed to have been sustained by the indicated claimants are as follows:

A. *Tex-Barge, Inc. and Marine Tow, Inc.:*

At the time of the collision described in the Complaint, the claimants' vessel M/V INLAND PILOT and its tow were bound from Mobile, Alabama, to Norco, Louisiana, to load cargo. Because of the collision referred to in the Complaint the vessel and its tow could not transit the Inner Harbor Navigational Canal Locks (hereinafter "Industrial Canal Locks") and the vessel and its tow were unable to reach Norco by that route. As stated in the Ninth Paragraph of their claim, Tex-Barge, Inc. and Marine Tow, Inc.

" . . . have sustained damage consisting of delay and detention of the claimants' vessel M/V INLAND PILOT and Barges STCO–200, STCO–201, and STCO–202, loss of profits, additional fuel and other supplies consumed, additional crew hire paid, and other substantial expenses necessarily incurred. . . ."

B. *Cabot Corporation:*

Cabot Corporation had an agreement with Stellman Transportation Company, under which Stellman was to transport feedstock for Cabot from Pascagoula, Mississippi, to Krotz Springs, Louisiana, by the most direct water route. Stellman's vessel was unable to transit the Industrial Canal Locks because of the collision referred to in the Complaint and was required to return to Pascagoula. Stellman has made claim on Cabot for freight and demurrage and Cabot claims that if it is liable to Stellman, then Lyra Shipping is liable to it because of its negligence.

C. *Magnolia Marine Transport Company:*

Magnolia's vessel, the M/V VALDA, and its tow were bound from Buck's Landing, Alabama, to Port Arthur, Tex-

as, but were unable to transit the Industrial Canal Locks because of the collision referred to in the Complaint. After waiting several days, the M/V VALDA and its tow

> ". . . proceeded down the Mississippi River Gulf Outlet in order to proceed along the coast of Louisiana in the Gulf of Mexico to the mouth of the Mississippi River, up the Mississippi River to the Algiers Locks to the Intracoastal Canal and on to Port Arthur."

(See Paragraph 4 of Claim.)

Once in the Gulf, the tow encountered heavy ground swells which caused the tow to break up. As stated in the Sixth Paragraph 6 of its claim:

> ". . . the tow of the M/V VALDA broke up and all vessels were damaged and ultimately had to be rescued."

## II. LEGAL CONTENTIONS OF THE PARTIES

Here, assuming for purposes of this motion that the claimants actually sustained the losses they describe, the defendant maintains that such losses are only indirect consequences of the collision of the GALAXY FAITH with the Industrial Canal Locks. The defendant argues that such damages are not recoverable because either (1) under admiralty law a third party has no right to sue a tortfeasor for damages which the third party has sustained as a result of a tort committed upon another, Robins Dry Dock & Repair Co. v. Flint, 1927, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290; Kaiser Aluminum & Chemical Corp. v. Marshland Dredging Co., Inc., 5 Cir. 1972, 455 F.2d 957; or (2) as a matter of law the losses claimed are too remote a consequence of the closure of the Industrial Canal Locks to constitute re-

coverable damages, Petition of Kinsman Transit Co., 388 F.2d 821 (2 Cir. 1968). *Cf.* Petition of Kinsman Transit Co., 338 F.2d 708 (2 Cir. 1964).

The plaintiffs claim they are clearly entitled to recover their damages, and seek to distinguish the cases cited by defendant. In *Robins,* for example, the time charterers of a vessel were seeking recovery for detention of the vessel resulting from negligent damage during shipyard repairs. The owners of the vessel had settled and released "all their claims." *Robins* thus held that an owner whose revenue-producing property is detained may indeed recover, but that one who happened to have a contract with the owner cannot also recover for his impairment from the same detention of the same property. Thus, plaintiff Tex-Barge argues, if its *customers* were the parties seeking recovery, *Robins* would likely be applicable; but here it is the owner of revenue-producing property and is as entitled to recover as were the settling shipowners in *Robins.*

Plaintiffs also argue that Congress has established a duty of all persons to keep free of obstructions any navigable waterway of the United States,[1] and suggests further that this duty, if breached, will subject the person causing such obstruction to civil liability to whatever persons are injured thereby. That this civil remedy is available not only to the United States but to private parties or individuals as well as clearly established. In Lauritzen v. Chesapeake Bay Bridge and Tunnel District,[2] the Court held that, while Federal navigation regulations prohibiting the obstruction of navigable waterways did not expressly provide for a cause of action for injured parties, such liability is clearly implied, and that civil liability is derived from 33 U.S.C.A. Section 403, pertaining to protection of navigable

---

1. 33 U.S.C.A. § 403, which states in part: "The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; . . . ."

2. 259 F.Supp. 633 (D.C.Va.1966); see also the Mahanoy, 273 F. 668 (C.C.A.N.Y. 1921); cert. den. 258 U.S. 618, 42 S.Ct. 272, 66 L.Ed. 794; also Carver v. San Pedro, L.A. & S.L.R. Co., 151 F. 334 (C.C.Cal.1906).

waters in favor of both the United States and private parties. Therefore, those who obstruct navigable waterways not only become liable to the United States, but in addition subject themselves to civil liability to any person or persons they particularly may have harmed as a result of the obstruction. Thus plaintiffs' claim that they are not merely third parties damaged incidentally by harms inflicted on others, but instead are persons directly aggrieved and possessing a cause of action in their own right.

Plaintiffs have also cited a case which defendant admits is on all fours with the present situation and in which liability was found to exist, In re China Union Lines, Ltd., 285 F.Supp. 426 (S.D. Tex.1967). In that case, the MV UNION RELIANCE negligently came into collision with the MV BEREAN in the Houston Ship Channel, and as a result, the channel was closed to all marine traffic for approximately two days. The plaintiff in that action filed suit against the UNION RELIANCE and her owners for loss of profits, additional fuel and other supplies consumed, additional crew hire paid, tug hire incurred to turn the vessel, debt time for longshoremen ordered in Houston and other substantial expenses. The plaintiff's argument was that the ship's obstruction of the channel created a public nuisance from which the plaintiff sustained special injuries, as distinguished from the theoretical and common injuries suffered by the public in general. This argument was based upon the statutorily created duty which has previously been discussed. The Court did not consider it necessary, however, to rely on such a theory in determining liability in that case. The Court stated that the case was simply one involving a negligent maritime tort, for which the vessel's owner is liable for all damages proximately resulting therefrom. The Court went further to say that the UNION RELIANCE certainly owed a duty to all those using or seeking to use the ship channel not to obstruct their passage. Further, the Court added that it was clearly foreseeable that a negligent collision in a narrow channel would effectively delay all traffic for at least some substantial period of time. When the negligence of the UNION RELIANCE caused the collision, the duty was breached, the foreseeable became fact, and defendant became liable for all the direct consequences thereof. Therefore, the Court held that such damages as the plaintiff was able to prove were incurred because they were denied normal access to the channel were recoverable. The Court's decision did not depend on whether the UNION RELIANCE was negligent in failing to clear the channel within a reasonable time; but instead the defendant was held responsible for all damages due to delay directly attributable to the negligent collision.

## III. CONCLUSIONS OF LAW

I believe that both the statutory "nuisance" doctrine and ordinary maritime tort law provide viable bases for recovery in this case. Under either rationale, it is plausible to argue that plaintiffs Tex-Barge, Inc. and Marine Tow, Inc., who incurred such additional expenses as extra fuel costs, wages, and the like can recover those damages upon proper proof, and I so hold.[3] This, how-

---

3. Defendant, *in terrorem*, suggests that to permit recovery of such costs to all carriers for the entire period the Industrial Canal Locks were closed to marine traffic would impose a crushing burden upon it. Plaintiffs suggest in response that no party should be able to recover such costs whose vessels were not already irrevocably committed to passage through the Locks at the time the accident occurred. The basis of this limitation is that once the nonavailability of the Canal became a foreseeable contingency, all shippers and carriers would be free in the future to protect their interests as best they could. Carriers could intelligently estimate their increased costs when offering their services; and shippers likewise could decide whether alternative modes of transportation should be employed in their businesses during the temporary emergency. It is argued, how-

ever, does not dispose of the problems of Cabot and Magnolia Marine Transport. Cabot Corporation occupies a position somewhat more remote from this accident that the plaintiffs Tex-Barge and Marine Tow. It, itself, was not a user of the Industrial Canal, but instead was a party having a contract with such a user, namely Stellman Transportation Co. The damages it seeks here, however, are the very ones which Stellman would be permitted to recover under my ruling with regard to Tex-Barge and Marine Tow. It does not attempt to recover additional sums growing out of impairment of its contractual obligations with more remote parties due to Stellman's late delivery.[4] Under those circumstances, I can see no reason why Cabot cannot recoup any additional charges it may become liable to Stellman for as a result of this accident. I may assume for purposes of this motion, that Stellman was obliged to incur additional costs in order to fulfill its contract with Cabot. Apparently Stellman is in a position where it can make itself whole either by passing these costs on to its customer Cabot or else by recovering them directly from Lyra Shipping. If it chooses the latter alternative, Cabot will of course incur no recoverable damages; but if Stellman elects to proceed against Cabot, that plaintiff is put more or less in the position of an equitable subrogee to Stellman's rights against Lyra Shipping. Clearly as between Cabot and Lyra Shipping it is the latter who should bear the cost of this surcharge.

■ The claims of Magnolia Marine present still more complicated problems than do those of Tex-Barge, Marine Tow and Cabot. In its brief in opposition to the motion for summary judgment, Magnolia describes how the main component of its loss occurred:

"After waiting three days at the Industrial Canal Locks, claimant was advised of the possibility that passage through the locks would be blocked for an absolute minimum of two weeks and a possible two or three months. Faced with the problem of returning to Buck's Landing, Alabama or, alternatively, proceeding to Port Arthur, Texas, Magnolia chose the latter. The Tug VALDA reversed her direction, proceeded down the Mississippi River Gulf Outlet into the Gulf of Mexico, and proceeded along the Coast of Louisiana toward the mouth of the Mississippi River, with the intention of proceeding up the river to the Algiers Locks, to the Intracoastal Waterway and on to Port Arthur. However, while in the Gulf of Mexico, the tug and her tow were surprised by unusual bad weather which was both unforeseen and not predicted."

This inclement weather caused the tow to break up, and all vessels were damaged and eventually had to be rescued. It is essentially salvage costs and damages to its tug and tow that Magnolia seeks to recover here.

Defendant argues—with much force it seems to me—that these consequences are far too remote and unforeseeable outgrowths of the GALAXY FAITH's collision to subject it to liability. The problem in this case often is cast in terms of "proximate cause" or "ambit of risk", Palsgraf v. Long Island R.R., 248 N.Y. 339, 162 N.E. 99 (1928). Few better discussions of such issues are extant that those appearing in the two *Kinsman Transit* cases cited above.[5] *Kinsman Transit I*. recounts what has to be among

---

ever, that those parties caught unawares were particularly vulnerable to the harm caused by the defendant's conduct and should be afforded special protection.

I need not decide that question now, as all the present claims grow out of damages suffered by carriers actually traversing the Canal at the time the Galaxy Faith struck the Industrial Canal Locks.

4. Such damages would be barred, I believe, under the doctrine of Robins Dry Dock & Repair Co. v. Flint, 1927, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290.

5. Petition of Kinsman Transit Co., 388 F.2d 821 (2d Cir. 1968); Petition of Kinsman Transit Co., 338 F.2d 708 (2d Cir. 1964).

the most bizarre collision accidents ever chronicled. In all-too-brief summary,[6] the negligent mooring of the MacGilvray Shiras permitted that vessel to be torn loose from its moorings by drifting ice and sent careening down the Buffalo River, where it crashed into a second ship, The Tewksbury. These two vessels in turn were impelled by the force of the current against a bridge, with such force that two towers of the bridge eventually collapsed. The two ships, wedged together in the wreckage, "substantially dammed the flow [of the river], causing water and ice to back up and flood installations on the banks with consequent damage [to a point] . . . nearly three miles upstream." Petition of Kinsman Transit Co., 338 F.2d 708, 713 (2d Cir. 1964) [*Kinsman I.*].

The various defendants in *Kinsman* I. argued that it would be improper to hold them liable for the full range of damages flowing from their negligent conduct, particularly the flooding of upstream landholders, as such consequences were wholly unforeseeable. The Second Circuit disagreed. It reasoned that while "[f]oreseeability of danger is necessary to render conduct negligent," [7] it was not necessary that the defendants envision the precise harm resulting from their conduct before liability could be imposed therefor:

[W]here . . . the damage was caused by just those forces whose existence required the exercise of greater care than was taken—the current, the ice, and the physical mass of the Shiras, the incurring of consequences other and greater than foreseen does not make the conduct less culpable or provide a reasoned basis for insulation.[8]

Thus the Second Circuit rejected the position that the mere fact that the precise damages incurred were not foreseeable provided a ground for exonerating the defendant therefrom. But the court also realized that not all damages, however remote, could be visited upon the defendants there, for there would come a time "when courts will agree that the link has become too tenuous—that what is claimed to be consequence is only fortuity." [9] This state of affairs was realized in Petition of Kinsman Transit Co., 388 F.2d 821 (2d Cir. 1968) [*Kinsman II.*]. In *Kinsman II.* the two claimants were Cargill, Inc. and Cargo Carriers, Inc. Neither sought recovery for direct physical damages to their property growing out of the collision and subsequent flood. Instead each sought reimbursement for accident-related additional expenditures necessary to fulfill various contractual obligations. The Second Circuit specifically declined to treat this case as a "negligent interference with contract" suit and deny recovery on that relatively straight-forward basis, Robins Dry Dock Co. v. Flint, 275

---

6. The cutting edge of this disaster, dulled somewhat now by the passage of time, is not without its amusing aspects. See 338 F.2d at 711–713.

7. 338 F.2d at 724.

8. Id. Judge Moore dissented from that portion of the majority opinion allowing for flood damage to upstream properties:

In final analysis the answers to the questions when the link is "too tenuous" and when "consequence is only fortuity" are dependent solely on the particular point of view of the particular judge under the particular circumstances. In differing with my colleagues, I must be giving "unconscious recognition of the harshness of holding a man for what he could not conceivably have guarded against, because human foresight could not go so far." (L. Hand, C. J., in Sinram v. Pennsylvania R. Co., 61 F.2d 767, 770, 2 Cir. 1932.) If "foreseeability" be the test, I can foresee the likelihood that a vessel negligently allowed to break its moorings and to drift uncontrolled in a rapidly flowing river may well strike other ships, piers and bridges. Liability would also result on the "direct consequence" theory. However, to me the fortuitous circumstance of the vessels so arranging themselves as to create a dam is much "too tenuous."

338 F.2d at 727–728. This view may well have prevailed in *Kinsman II*. See note 10, *infra*.

9. 338 F.2d at 725.

U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927), but instead permitted plaintiffs to employ a broader tort rationale. Although the court felt that the damages these two parties had incurred were "foreseeable" consequences of the defendants' acts—at least as that term had been defined in *Kinsman* I.[10]—it held that nonetheless "the connection between the defendants' negligence and the claimants' damages [was] too tenuous and remote to permit recovery." 388 F. 2d at 825. The court philosophized on the problem of when to hold a defendant liable for the remote consequences of its actions in a manner I find helpful in resolving the questions before me:

> Numerous principles have been suggested to determine the point at which a defendant should no longer be held legally responsible for damage caused "in fact" by his negligence . . . Such limiting principles must exist in any system of jurisprudence for cause and effect succeed one another with the same certainty that night follows day and the consequences of the simplest act may be traced over an ever-widening canvas with the passage of time.

> . . . . . .

> In the final analysis, the circumlocution whether posed in terms of "foreseeability," "duty," "proximate cause," "remoteness," etc. seems unavoidable. As we have previously noted, 338 F.2d at 725, we return to Judge Andrews' frequently quoted statement in Palsgraf v. Long Island

R.R., 248 N.Y. 339, 354–355, 162 N.E. 99, 104, 59 A.L.R. 1253 (1928) (dissenting opinion): "It is all a question of expediency * * * of fair judgment, always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind."

388 F.2d at 824–825.

Applying these general principles to the claim of Magnolia Marine, I feel that the damages it sustained are beyond the ambit of risk created by Lyra Shipping's presumably negligent conduct and hence not recoverable.[11] Magnolia's loss is of a type that could not reasonably be anticipated by Lyra Shipping as one likely to result from its allegedly improper actions. It is remote both in time and space from the original accident. It could not have occurred at all had not an additional event, unanticipated bad weather,—which by its very nature is unforeseen—also transpired. To hold Lyra Shipping responsible for the damages incurred by Magnolia here would amount to making it an insurer. "The law does not spread its protection so far." Robins Dry Dock, *supra*, 275 U.S. at 309, 48 S.Ct. at 135.

Magnolia argues forcefully that as between it and Lyra Shipping, the latter should in all equity be obliged to bear this loss, as it was Lyra Shipping's culpable conduct that subjected Magnolia to the contingency that resulted in its damages. I have considered this position carefully, but I am obliged to disagree.

---

10. The Second Circuit's reference to its discussion of foreseeability in *Kinsman I*. seems rather unenthusiastic. See 388 F.2d at 824–825 & nn. 4–6.

11. It is not of controlling importance that under my holding with regard to Tex-Barge, Marine Tow, and Cabot Corp., Magnolia was also owed a duty by Lyra Shipping to use reasonable care in traversing the Industrial Canal Locks and that defendant (presumably) breached that duty. As the court in *Kinsman II*. explained:

  We previously held that "all the claimants here met the Palsgraf . . .

requirement of being persons to whom the actor owed a 'duty of care.' " 338 F.2d at 772. This passage is certainly applicable to Cargill's claim for flood damage to its upstream property. . . . We need not decide which, if any, defendants owed Cargill a duty of care with respect to its unrelated claims . . . since even if Palsgraf is satisfied, compensation may be precluded where—as here—the relationship between the negligence and the injury becomes too tenuous. . . .

388 F.2d at 824, n. 6.

If the word "causation" is to retain any useful meaning, it cannot be employed to describe the relationship between Lyra Shipping's conduct at the Industrial Canal Locks and the harm that befell Magnolia's tug and tow in the Gulf of Mexico. If it is true that the inclement weather encountered by Magnolia was "both unforeseen and not predicted"—as Magnolia takes pain to point out in its brief—then it seems to me that there is no more reason to visit its consequences on Lyra Shipping than there is to permit the damages to remain where they fell.

For these reasons, I deny the motion for summary judgment of Lyra Shipping as it relates to the claims of Tex-Barge, Inc., Marine Tow, Inc., and Cabot Corporation, and grant it as it relates to the claims of Magnolia Marine Transport Co.