FEDERAL COMMERCE & NAVIGATION CO., LTD., Plaintiff,

v.

The M/V MARATHONIAN, her engines, etc., and Europa Shipping Corporation, Defendants.

No. 74 Civ. 1899 (JMC).

United States District Court,
S. D. New York.

April 8, 1975.

Healy & Baillie, New York City (Nicholas J. Healy and Edward J. Miller, New York City, of counsel), for plaintiff.

Burlingham, Underwood & Lord, New York City (Kenneth H. Volk and Michael C. Bynane, New York City, of counsel), for defendants.

## MEMORANDUM DECISION

CANNELLA, District Judge:

■ Upon the authority of Robins Dry Dock & Repair Co. v. Flint, 275 U. S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927), the defendants have moved the Court for an order dismissing the complaint for failure to state a claim upon which relief can be granted.[1] As we find the decision in *Robins* controlling, the motion is hereby granted.

Accepting, as we must on motions of the instant nature, the allegations of the complaint as true, the facts giving rise to this controversy are easily stated. At all times here relevant, the plaintiff, Federal Commerce & Navigation Co., was the time charterer of the M.V. ROLWI under a time charter dated January 21, 1970. On October 2, 1973, the M.V. ROLWI was involved in a collision on Lake Michigan with the M.V. MARATHONIAN, a vessel owned and operated by the defendant Europa Shipping Corporation. Plaintiff alleges that "[t]he aforesaid collision was not caused or contributed to by any fault or negligence on the part of Plaintiff, but was caused in whole or in part by fault and negligence of Defendant, the M.V. MARA-

THONIAN, and those in charge of the said vessel, and in particular by the operation of the said vessel at a highly excessive rate of speed in dense fog." (Complaint at ¶ 6.) It is further alleged in the complaint that as the result of this collision, "Plaintiff has sustained damages consisting of the loss of use of the M.V. ROLWI, and expenses incidental thereto, which, as nearly as can be estimated at present, will amount to approximately Seven Hundred Thousand ($700,000.00) Dollars . . . ." (Complaint at ¶ 7.)

To these facts, the Court's decision in *Robins* squarely applies. In *Robins*, a time charterer sued a drydocker to recover damages (loss of use and profits) arising from a delay in the release of the chartered vessel from drydock, such delay having been caused by the drydocker's negligent injury to the ship's propeller. Mr. Justice Holmes, after first rejecting the notion that a recovery might be had by the charterer under contract and third-party beneficiary principles, posed the question of the case in these terms: "whether the [charterers] have an interest protected by the law against unintended injuries inflicted upon the vessel by third persons who know nothing of the charter." 275 U.S. at 308, 48 S.Ct. at 135. To that question the Justice, writing for a unanimous Court, answered:

> Their loss arose only through their contract with the owners—and while intentionally to bring about a breach of contract may give rise to a cause of action [citation omitted], no authority

1. On October 15, 1974, the defendants interposed the instant motion and denominated it as one pursuant to Fed.R.Civ. 12(b)(6). It appears, however, from the files and records of this cause that prior thereto, on June 27, 1974, the defendants filed an answer to the plaintiff's complaint. Thus, a motion under Rule 12(b)(6) cannot properly lie because "A motion making any of these defenses shall be made before pleading. . . ." Fed.R.Civ.P. 12(b). However, as the Seventh Circuit has pointed out, "A motion to dismiss made after the filing of an answer serves the same function as a motion for judgment on the pleadings and may be regarded as one." Schy v. Susquehanna Corp., 419 F.2d 1112, 1115 (7 Cir.), cert. denied, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970). Accordingly, we deem the instant motion to constitute one for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) (or, alternatively, for summary judgment under Rule 56(b)). As Judge Clark stated in Central Mexico Light & Power Co. v. Munch, 116 F.2d 85, 87 (2 Cir. 1940), "Since the same relief is sought, the difference in name is unimportant."

need be cited to show that, as a general rule, at least, a tort to the person or property of one man does not make the tort-feasor liable to another merely because the injured person was under a contract with that other, unknown to the doer of the wrong. [Citation omitted]. The law does not spread its protection so far.

*Id.* at 308–09, 48 S.Ct. at 135.

■ The Supreme Court's holding in *Robins* was later summarized by Judge Learned Hand in the following fashion:

[The Supreme Court] thought that the only basis for charging the drydocker with liability was because he had prevented the performance of the charterparty by the promisor—the owner—and that interference by a third person with the performance of a contract was an actionable wrong only if it was intentional. The Court thought it irrelevant that this resulted in exonerating the drydocker from nearly all liability through the fortuity that the profitable use of the ship had been divided between the owner and the charterer: the difficulty went deeper; the drydocker had committed no legal wrong against the charterer at all, though he had caused it serious damage.

Agwilines, Inc. v. Eagle Oil & Shipping Co., 153 F.2d 869, 871 (2 Cir.), cert. denied, 328 U.S. 835, 66 S.Ct. 980, 90 L. Ed. 1611 (1946). Simply put, the rule of *Robins* is clear: A time charterer (who is without any property right in the vessel) [2] cannot recover pecuniary losses sustained as the result of a third-party's negligent interference with the performance of the contract between the charterer and the vessel's owner.

Mr. Justice Holmes' decision in *Robins* and the principle of law established therein were followed by the Court of Appeals for this Circuit in the *Agwilines* case, *supra,* and this view has been consistently adhered to by other federal

2. As Mr. Justice Holmes aptly pointed out in fashioning the rule of *Robins,* a demise charter is not involved in the circumstances under consideration, and, therefore, the consequences of a property interest in the charterer need not be looked into. Professors Gilmore and Black indicate the distinctions between time and demise charters in the following terms:

*The Time Charter.* In this form . . . the owner's people continue to navigate and manage the vessel, but her carrying capacity is taken by the charterer for a fixed time for the carriage of goods anywhere in the world (or anywhere within stipulated geographic limits) on as many voyages as approximately fit into the charter period. She is therefore under the charterer's orders as to ports touched, cargo loaded, and other business matters. The time charter is used where the charterer's affairs make it desirable for him to have tonnage under his control for a period of time, without undertaking the responsibilities of ship navigation and management or the long-term financial commitments of vessel ownership. The company operating regular liner service may, for example, find itself temporarily short of tonnage and wish to place another vessel in the service; it can do this with relatively slight trouble and without indefinitely long commitment if it can find a suitable vessel to take on time charter.

*The Demise or Bareboat Charter.* In this form, the charterer takes over the ship, lock, stock and barrel, and mans her with his own people. He becomes, in effect, the owner *pro hac vice,* just as does the lessee of a house and lot, to whom the demise charterer is analogous. Obviously, such an arrangement is suitable to the needs of anyone who wants to, for a time, to be in the position of the owner of a vessel, but who does not want to go to the expense and trouble of buying one or having one built. The demise, as well as the time charter, may answer the need of the shipping line temporarily short on tonnage; whether a company in this position wants to take a ship on time or on demise will depend on whether the advantages of the complete control enjoyed by the demise charterer seem, in the actual situation, to outweigh the rather heavy responsibilities that he assumes, as owner, in effect, for the time being.

G. Gilmore & C. Black, The Law of Admiralty § 4–1 at 194 (2 ed. 1975) (footnote omitted). *See also, id.* at § 4–20; W. Poor, American Law of Charter Parties and Ocean Bills of Lading § 7 at 25–26 (5 ed. 1968); G. Robinson, Handbook of Admiralty Law § 83 at 593–600 (1939).

courts.[3] Contrary to plaintiff's assertion, *Robins* correctly reflects the present state of law concerning negligent interference with contract, as evidenced by the Restatement (Second) of Torts § 766B (Tent.Draft No. 14, 1969), which states in relevant part:

(1) Except as stated in subsection (2) [concerning the negligent failure to transmit a telegraph message], and in the case of bodily harm to a servant, there is no liability for pecuniary harm caused by

(a) negligent interference with the performance of a contract, or

(b) negligently causing a third person not to enter into or continue a business or other advantageous relation with another.[4]

Thus far there has been very little recognition of any liability for such interference when it results from conduct which is merely negligent. The explanation usually given by the courts, when one is given at all, is that such harm is too "remote" for negligence liability, and that the defendant's conduct is not the "proximate cause." In most, if not all, of the cases in which recovery has been denied, the defendant has had no knowledge of the contractual or prospective relation, and no reason to foresee any harm to the plaintiff's interests; and the decision sometimes has been justified under the rule as to unforeseeable plaintiffs stated in § 281. It seems more likely, however, that it is the character of the contract or prospective interest itself which has led the courts to refuse to give it protection against negligence. They apparently have been influenced by the extremely variable nature of such relations, the fear of an undue burden upon the defendant's freedom of action, the probable disproportion between the large damages which might be recovered and the extent of the defendant's fault, and perhaps in some cases the difficulty of determining whether the interference has in fact resulted from the negligent conduct. What the reason may be . . . there is as yet no liability for negligent interference with the performance of a contract, or with a prospective contract relation.

*Illustrations:*

1. A has contracted to tow a barge owned by B between two ports. Before the contract can be performed, C negligently sinks the barge, and A is prevented from towing it, and so deprived of the profit to be made out of the towage fees. C is not liable to A.

*Id.* at 56. The Explanatory Notes further indicate that

Illustration 1 is taken from La Société Anonyme de Remorguage a Hélice v. Bennetts, [1910] 1 K.B. 243. In *accord* are Robins [Robins] Dry Dock & Repair Co. v. Flint, (1927) 275 U.S. 303 [48 S.Ct. 134, 72 L.Ed. 290] (charterer); Petition of

---

3. *See, e. g.*, Kaiser Aluminum & Chem. Corp. v. Marshland Dredging Co., 455 F.2d 957, 958 (5 Cir. 1972) *(per curiam)*; J. Ray McDermott & Co. v. S. S. Egero, 453 F.2d 1202, 1203–04 (5 Cir. 1972); Keene Lumber Co. v. Leventhal, 165 F.2d 815, 821–22 n. 4 (4 Cir. 1948); Rederi A/B Soya v. Evergreen Marine Corp., 1972 A.M.C. 1555, 1562–1566 (E.D.Va.1971); Dampskibsaktieselskabet Den Norske v. Intalco Aluminum Corp., 306 F.Supp. 170, 176 (W.D.Wash. 1969), aff'd, 457 F.2d 889 (9 Cir.), cert. denied, 409 U.S. 1024, 93 S.Ct. 466, 34 L. Ed.2d 316 (1972); Guarrasi v. Panama Canal Co., 271 F.Supp. 678, 680 (D.C.Z.1967); Henderson v. Arundel Corp., 262 F.Supp. 152, 159–60 (D.Md.1966), aff'd mem. 384 F. 2d 998 (4 Cir. 1967); Shell Oil Co. v. S.S. Tynemouth, 205 F.Supp. 838, 839 (E.D.La.), vacated on other grounds, 211 F.Supp. 908 (E.D.La.1962); *and see* the commentaries contained in W. Poor, American Law of Charter Parties and Ocean Bills of Lading § 7 at 25 n. 3 (5 ed. 1968); G. Robinson, Handbook of Admiralty Law § 87 at 632–34 (1939). For a recent discussion of the law concerning negligent interference with economic expectancy, *see*, Union Oil Co. v. Oppen, 501 F.2d 558, 563–68 (9 Cir. 1974), wherein the court approvingly cites the decision in *Robins* at p. 564. *See also*, 88 Harv.L.Rev. 444 (1974). *Compare*, Borcich v. Ancich, 191 F.2d 392 (9 Cir. 1951), cert. denied, 342 U.S. 905, 72 S.Ct. 293, 96 L.Ed. 677 (1952) and Cusumano v. The Curlew, 105 F.Supp. 428 (D.Mass.1952) *with* Carbone v. Ursich, 209 F.2d 178 (9 Cir. 1953) (wherein the Ninth Circuit overruled its earlier decision in *Borcich*). The English authorities are in apparent accord with the *Robins* view. *See*, W. McNair & A. Mocatta, Scrutton on Charter Parties and Bills of Lading 6 (17th ed. 1964).

4. The Explanatory Notes to § 766B of the Restatement (Second) of Torts, Comment a, recite the rationale for the rule adopted by the Institute.

Liability for interference with contracts, or with prospective contract relations, developed in the field of intentional torts.

*See also,* 46 ALI Proceedings 205–22 (1969); W. Prosser, Law of Torts § 129 at 938–42 (4 ed. 1971); Note, Negligent Interference with Economic Expectancy: The Case for Recovery, 16 Stan.L.Rev. 664 (1964).

We recognize, however, that the rule enunciated in *Robins* and the broader concept that negligent interference with the performance of a contract does not state a cognizable claim have been the subject of severe criticism by many commentators. *See, e. g.,* 1 F. Harper & F. James, The Law of Torts § 6.10 at 501–505 (1956);[5] Prosser, *supra,* at 940 ("[n]o very satisfactory reason has been

---

Kinsman Transit Co., (2 Cir. 1968) 388 F. 2d 821 (river blocked, ship unable to deliver cargo upstream); Louisville & Nashville R. Co. v. Arrow Transp. Co., (N.D.Ala.1959) 170 F.Supp. 597; Petition of S. C. Loveland Co., (E.D.Pa.1959) 170 F.Supp. 786 (plaintiff had contracted to discharge barge at a pier).

*Id.* at 60. *See also,* W. Prosser, Law of Torts § 129 at 938:

> Interference with contract, which had its modern inception in "malice," has remained almost entirely an intentional tort; and in general, liability has not been extended to the various forms of negligence by which performance of a contract may be prevented or rendered more burdensome. [Footnote omitted].

5. In their treatise, Harper and James state:

> It is believed that many of the cases which purport to deal with this question and much of the literature which discusses them have misconceived the problem and have beclouded rather than clarified the issues. Indeed, in most instances, the problem of negligent interference with contract relations seems to be wholly artificial.
>
> Much of the confusion derives from the opinion of Justice Holmes in Robins Dry Dock & Repair Company v. Flint.
> . . .
> With the emphasis . . . laid on the wrongdoer's knowledge or lack of knowledge of the contract, discussion of the *Robins* case has invariably been cast in the mould of negligent interference with contract relations. It is submitted that the issue of "knowledge" has been largely overemphasized on the one hand, and is largely irrelevant on the other.
>
> In the first place, if "knowledge" were important, it is hard to understand why defendant should not be charged with knowledge that the plaintiff was or might well be a charterer entitled to the use of the vessel which he delivered to the dry dock to be repaired under a contract which the defendant had made with the owner. And if it be argued that the defendant would assume that the master of the vessel was acting for and on behalf of the owners, it might be a sufficient answer that such an assumption is hardly warranted in an industry where charter parties are common and vessels are, perhaps as frequently as not, operated by persons other than their owners. "Knowledge" of the existence of the contract or lack of it could hardly be decisive if the general principles of negligence are applicable. It should be enough to establish a prima facie case if the defendant, as a resonable man, should have known of the likelihood of the existence of the contract and thereafter created an unreasonable risk of interfering with it. The analogy to negligent injury to persons is clear. Not only is it negligent to create unreasonable risks to persons whose presence is known but to those whom the actor has reason to expect in the area of his conduct and who thus may be exposed to the risk.
>
> More important, knowledge on the part of the defendant that the ship was being operated by persons other than the owners would seem to be irrelevant, as having nothing to do with the defendant's primary liability. It is a long-standing rule of damages that recovery for damage tortiously caused to a chattel may include not only the cost of repairs but the value of the use of the chattel while it is undergoing repairs. A similar rule prevails in the case of damage to real estate which involves repairs and the loss of use. If there had been no charter party in the *Robins* case, there seems to be no doubt that the owner could have recovered for the loss of the vessel's use which resulted from the negligently damaged propeller. Again, if the damage had been done to the vessel while the charterer was in active operation of it, his recovery could be supported on analogy to old and unquestioned principles of law. The defendant should not be permitted to plead the jus tertii.
>
> . . . . .
>
> Following up the lead in Mr. Justice Holmes' opinion in the *Robins* case, most of the writers and commentators have treated the problem involved as one of negligent injury to contract relations, a new and novel problem to be dealt with in a way analogous to the treatment accorded the situation in Lumley v. Gye rather than a relatively simple variant of an old

given for this refusal of a remedy in negligence cases."); 88 Harv.L.Rev. 444 (1974). Indeed, were this Court now free to write upon a *tabula rasa* and not constrained by the weight of precedent, we would reject the negligent interfer- ence with contract doctrine in favor of a negligence-causation-foreseeability analysis, such as that adopted by Chief Judge Kaufman in Petition of Kinsman Transit Co., 388 F.2d 821, 823–24 (2 Cir. 1968) [*Kinsman II*].[6] *See also,* Ira

---

problem of damage to land or chattels in which there are multiple interests deriving from a conveyance or a contract.

1 F. Harper & F. James, *supra* at 501–505 (footnotes omitted).

In a recent article, Professor James has stated:

It remains to be considered whether the present rule may be too broad—whether its sweep may exclude liability in some situations to which the pragmatic objection has no valid application. Take, for example, the case of a ship's charterer who loses its use, and even may have to pay hire, during the time when the ship is laid up for repairs necessitated by defendant's negligence. If there were no charter, the owner who lost the vessel's use could recover for that loss measured by its reasonable value. If the defendant were liable to the charterer instead, it would not be a wide and open-ended liability, but a finite one that the tortfeasor or his liability insurer would expect to pay under frequently occurring circumstances. There seems to be no valid reason why defendant should escape this ordinary item of damage just because the loss in this case happened to be suffered by one who had no proprietary interest in the ship. What has been called the pragmatic objection simply has no application. There are some practical—or "pragmatic"—difficulties, but they are of a different nature and a lower order of magnitude. There are questions of proper parties, of the proper measure of damages, of the protection of defendant against multiple vexation and double liability, and of protection of the settlement process. All these difficulties, however, are readily solvable by familiar procedural devices. The presence of both the charterer and owner as parties plaintiff in the suit could be required, and this would answer proper parties and multiple vexation questions. The measure of damages, in any event, should be limited to reasonable value. Settlement in good faith with either party should be held to bar the other on the very appropriate analogy from the law of bailment.

James, Limitations on Liability for Economic Loss Caused by Negligence: A Pragmatic Appraisal, 25 Vand.L.Rev. 43, 55–57 (1972). *See also,* Note, 16 Stan.L.Rev., *supra* at 689–93.

6. The *Kinsman* litigation arose from one of the most bizarre set of circumstances recorded in the federal case law. The facts, most briefly stated, are as follows: As the result of negligent mooring, the MacGilvray Shiras was torn loose from its moorings by drifting ice and sent crashing down the Buffalo River, where it crashed into a second ship, The Tewksbury. In turn, these two vessels were impelled by the current of the river against a bridge with such force that two towers of the bridge eventually collapsed. In addition, the two ships, which had been wedged together in the wreckage, "substantially dammed the flow [of the river], causing water and ice to back up and flood installations on the banks with consequent damage [to a point] . . . nearly three miles upstream." Petition of Kinsman Transit Co., 338 F.2d 708, 713 (2 Cir. 1964) [*Kinsman I*], cert. denied sub nom., Continental Grain Co. v. City of Buffalo, 380 U.S. 944, 85 S.Ct. 1026, 13 L.Ed.2d 963 (1965).

In *Kinsman I*, the various defendants sought to avoid the imposition of liability for the damages flowing from their negligent conduct, particularly the damages caused by the flooding of upstream landholders. They argued that such consequences were unforeseeable. Judge Friendly, writing for the Court of Appeals, disagreed. He stated that while "[f]oreseeability of danger is necessary to render conduct negligent," 338 F.2d at 724, it was not required that the defendants envision the precise harm resulting from their conduct before liability could be imposed.

[W]here as here the damage was caused by just those forces whose existence required the exercise of greater care than was taken—the current, the ice, and the physical mass of the Shiras, the incurring of consequences other and greater than foreseen does not make the conduct less culpable or provide a reasoned basis for insulation.

*Id.* While thus adopting a view that liability would lie despite the fact that the precise damages incurred were not foreseeable, Judge Friendly cautioned: "Somewhere a point will be reached when courts will agree that the link has become too tenuous—that what is claimed to be consequence is only fortuity." *Id.* at 725.

The decision of the court in *Kinsman I* set the stage for Chief Judge Kaufman's subse-

S. Bushey & Sons, Inc. v. United States, 398 F.2d 167, 171–73 (2 Cir. 1968); In re Lyra Shipping Co., Ltd, 360 F.Supp. 1188, 1192–94 (E.D.La.1973); Chicago

quent decision in *Kinsman II*. In *Kinsman II*, two claimants sought to recover for accident-related additional expenditures necessary to fulfil various contractual obligations. In the course of rejecting these claims on foreseeability grounds, Judge Kaufman cast doubt upon the vitality of the *Robins* holding by stating:

> Judge Burke refused to confirm either the Gillies or the Farr awards made by the Commissioner. He reasoned that the evidence established that the damages to Cargill and Cargo Carriers were caused by negligent interference with their contractual relations. In the absence of proof that the interference was intentional or with knowledge of the existence of the contracts, he concluded recovery could not be grounded in tort. Robins Dry Dock and Repair Co. v. Flint, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927). *We too* deny recovery to the claimants, but on other grounds.
>
> We do not encounter difficulty with Judge Burke's analysis because it lacks some support in the case law; instead, we hesitate to accept the "negligent interference with contract" doctrine in the absence of satisfactory reasons for differentiating contractual rights from other interests which the law protects. . . . Professors Harper and James suggest that the application of the doctrine is wholly artificial in most instances. Id. at 501. We therefore prefer to leave the rock-strewn path of "negligent interference with contract" for more familiar tort terrain. Cargill and Cargo Carriers argue broadly that they suffered damage as a result of defendants' negligence and we will deal with their claims in these terms instead of on the more esoteric "negligent interference" ground.
>
> Having determined our course, we nevertheless conclude that recovery was properly denied on the facts of this case because the injuries to Cargill and Cargo Carriers were too "remote" or "indirect" a consequence of defendants' negligence.
>
> . . . . . . .
>
> . . . [W]e hold that the connection between the defendants' negligence and the claimants' damages is too tenuous and remote to permit recovery. "The law does not spread its protection so far." Holmes, J., in Robins Dry Dock, *supra*, 275 U.S. at 309, 48 S.Ct. at 135.
>
> In the final analysis, the circumlocution whether posed in terms of "foreseeability," "duty," "proximiate [sic] cause," "remoteness," etc. seems unavoidable. As we have previously noted, 338 F.2d at 725, we return to Judge Andrews' frequently quoted statement in Palsgraf v. Long Island R.R., 248 N.Y. 339, 354–355, 162 N.E. 99, 104, 59 A.L.R. 1253 (1928) (dissenting opinion): "It is all a question of expediency * * * of fair judgment, always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind." 388 F.2d at 823–25.

In view of the tenor of Judge Kaufman's remarks, *supra*, this Court is of the view that the Court of Appeals may well consider *Robins* to have been discarded *sub silentio* by the decision in *Kinsman II*. Such approach was apparently adopted by Judge Cassibry in In re Lyra Shipping Co., 360 F. Supp. 1188, 1192–94 (E.D.La.1973). *Cf.*, Chicago & Western Indiana R.R. Co. v. The Buko Maru, Nos. 70 C 2259 and 70 C 1837 (N.D.Ill. June 19, 1973), aff'd, 505 F.2d 579 (7 Cir. 1974). However, we believe it to be presumptuous for us to conclude that the Second Circuit has *sub silentio* overruled *Robins*, especially in light of the decisions of the Fifth Circuit, rendered after the decision in *Kinsman II*, which adhered to *Robins*. *See*, Kaiser Aluminum & Chem. Corp. v. Marshland Dredging Co., 455 F.2d at 958 and J. Ray McDermott & Co. v. S.S. Egero, 453 F.2d at 1203–04.

Given this quandary, as well as our own attitude concerning the propriety of the *Robins* rule, we perceive two viable alternatives in the present case. The first is to deny the instant motion upon the authority of *Kinsman II* and the views of the commentators and certify the matter to the Court of Appeals pursuant to 28 U.S.C. § 1292(b). However, in view of the fact that the Court of Appeals retains discretion to decline to accept such an interlocutory appeal, we reject this alternative as unsound. *Cf.*, Slade v. Shearson, Hammill & Co., Inc., No. 74–1537 (2 Cir. Dec. 16, 1974). The second alternative, that which we choose to follow, is to grant the motion and enter a final, appealable judgment. By so acting, we will assure the parties a full and speedy review of the single legal issue presented, without need of extended proceedings in this Court. This will serve the interests of judicial economy and we urge the appellate courts to resolve the matter and provide direction to the district courts for the resolution of this and other similarly situated controversies.

& Western Indiana R.R. Co. v. The Buko Maru Nos. 70 C 2259 and 70 C 1837 (N.D.Ill.1973), aff'd, 505 F.2d 579 (7 Cir. 1974); *and see* the recent English case of Spartan Steel & Alloys Ltd v. Martin & Co. (Contractors) Ltd., [1972] 3 All E.R. 557 (C.A.) (particularly the opinion of E. Davies, L.J. at 569).[7]

■ In the instant case, however we feel bound by the Supreme Court's decision in *Robins*. We believe that the *Robins* decision must be adhered to by the lower federal courts, at least in instances involving the factual contours of that case, namely the negligent interference with a time charterer's contract rights by third parties, until such time as the Supreme Court directs otherwise. A *nisi prius* judge should not overturn the non-constitutional precedents established by the Supreme Court because as the Second Circuit has aptly put it, "we

7. The recent Harvard Law Review note points up the defects in premising the present rule on nonforeseeability grounds in these words:

At the core of the court's analysis [in Union Oil Co. v. Oppen, 501 F.2d 558 (9 Cir. 1974)] is an assumption that the rule of nonliability was adopted in order to limit recovery to reasonably foreseeable consequences of negligent conduct. This assumption is not borne out by case law. When, for example, the power line of a factory is negligently cut, loss of profits would appear to be just as foreseeable as physical damage to items within the factory, yet only plaintiffs suffering physical damage are permitted to recover. Indeed, the absence of any direct relationship between foreseeability and the nonliability rule is illustrated by a recent case in which an English court expressly assumed that the closing of local cattle markets was a foreseeable result of the escape of a virus from defendant's laboratory, but denied recovery to the owners of the markets. Moreover, the exceptions to the general rule of nonliability which were discussed by the *Oppen* court do not appear to be grounded in a higher level of foreseeability but, rather, seem responsive to specific social policies. Finally, a rule based on foreseeability would be a superfluous addition to the law of torts; where plaintiff's injury is not reasonably foreseeable, the court can refuse to permit recovery on that ground alone. Thus, the basis for denying recovery for negligently caused economic loss must lie elsewhere than in the problem of foreseeability.

88 Harv.L.Rev. at 447–48 (footnotes omitted). In like fashion the student note contained in 16 Stan.L.Rev. at 692 states

that the courts may indeed be applying, *sub silentio* and with heavy emphasis on the progressive difficulty of establishing foreseeability as economic injury becomes less immediately connected with injury to some tangible asset, some version of the balancing-of-interests test suggested in the foregoing sections. But even if this is so, the aggregate results of decided cases will be undesirably influenced by the tendency of many courts to emphasize unnecessarily "lack of foreseeability," perhaps because they feel that economic interests are not as important as tangible interests. But most of the cases in this area involve business enterprises, and the economic relations are usually as important as and often more important than its chattels. For the foregoing reasons foreseeability of injury is a proper requirement which should be applied as a test here in as broad and extensive a fashion as it is in other areas of negligence law.

This author concluded that

The rule against recovery for negligent interference with economic expectancy should be relaxed. The determination of whether recovery should be permitted in particular cases will involve the weighing of several factors. The prerequisites of negligent conduct, actual causation and foreseeability of harm must be satisfactorily established. The recovery should follow if it is indicated by a balancing of the interests in favor of recovery, which include the plaintiff's interest in his economic expectancy and the social interests in the stability of economic relations and discouragement of negligent conduct, and the interests against recovery, including the interests of defendant and society in a maximum of freedom of action. The social interest in allocating loss to the better loss distributor may appear on either side of the scale, will often be irrelevant, and probably must be applied to classes of fact situations rather than to each case, but it should be included in this balancing test where it is appropriate. Only when this rule against recovery has been eliminated will economic expectancies receive the protection which writers have urged, which the courts are beginning to grant, and which their social importance justifies.

*Id.* at 693–94.

**916**

continue to believe that the Supreme Court should retain the exclusive privilege of overruling its own decisions, save perhaps when opinions already delivered have created a near certainty that only the occasion is needed for pronouncement of the doom." Salerno v. American League of Professional Baseball Clubs, 429 F.2d 1003, 1005 (2 Cir. 1970) cert. denied, 400 U.S. 1001, 91 S.Ct. 462, 27 L.Ed.2d 452 (1971). *See also,* Rederi A/B Soya v. Evergreen Marine Corp., 1972 A.M.C. 1555, 1566 (E.D.Va.1971). No recent decision of the High Court has presaged the doom of *Robins,* and, therefore, we adhere to it in the matter at bar.

For all of the reasons aforestated, the defendants' motion is hereby granted and the Clerk of the Court is hereby directed to enter judgment dismissing the complaint as to all defendants.

It is so ordered.