## CITY OF PHILADELPHIA v. STANDARD OIL CO. OF PENNSYLVANIA.*

No. 5704.

Circuit Court of Appeals, Third Circuit.

Sept. 30, 1935.

BUFFINGTON, Circuit Judge, dissenting.

*Writ of certiorari denied 56 S. Ct. 443, 80 L. Ed. ——.

G. Coe Farrier and David J. Smyth, City Solicitor, both of Philadelphia, Pa., for appellant.

Howard H. Rapp, W. James MacIntosh, Wm. Clarke Mason, and Clement B. Wood, all of Philadelphia, Pa. (Morgan, Lewis & Bockius, of Philadelphia, Pa., of counsel), for appellee.

Before BUFFINGTON, DAVIS, and THOMPSON, Circuit Judges.

THOMPSON, Circuit Judge.

The appellant is a city of the first class of the commonwealth of Pennsylvania. The appellee is a Delaware corporation which owns riparian rights along the Schuylkill river, a navigable stream partly within the appellant's corporate limits. Cities of the first class are authorized by the Pennsylvania Act of July 22, 1913, P. L. 911 (53 PS Pa. § 4351), to construct retaining structures or bulkheads along the banks of navigable streams within their corporate limits for the purpose of protecting the channel of the stream. The act imposes the duty upon any riparian owner, who uses the "retaining structure for the purpose of constructing, extending, altering, improving or repairing, any wharf, or other building in the nature of a wharf, or other harbor structure, or for other wharf purposes," to pay the appellant for the part used. The appellant built bulkheads along the banks of the Schuylkill river, under authority of the Pennsylvania Act of 1913, supra. The appellee constructed two wharves, one 60 feet and the other 35 feet 8 inches in length, and physically incorporated in that construction a part of the bulkheads. In addition, the appellee dredged the channel of the river for at least 895 feet 10 inches to a sufficient depth outside its northerly wharf to float vessels having a draught of 12 feet and outside its southerly wharf, to a sufficient depth to float vessels having a draught of 30 feet, and constructed ten dolphins in front of the bulkheads, thus forming a basin for its steamers. The appellee tendered $11,249.22 in payment for the use it had made of 95 feet 8 inches of the bulkheads in the construction of the two wharves, but refused to pay the appellant for the alleged use of the bulkheads in the construction of the steamer basin, on the grounds that the act was unconstitutional if construed so as to require an individual to pay for a public improvement, and that neither the dredging of the river bottom, nor the placing therein of the dolphins or buoys for mooring its vessels to form its ship basin came within any of the purposes set out in the act imposing liability upon riparian owners. The appellant brought an action in assumpsit to recover $79,907.89. By stipulation of the parties, the case was tried by the court without the intervention of a jury. The court entered judgment for the appellant for the amount admitted to be due. This appeal is from the denial of judgment for the full amount claimed.

The court held the act to be constitutional, but found on the facts that the appellee was not liable to reimburse the appellant for more than the portion of the bulkheads used in the construction of the two wharves. It found that the appellee had not physically incorporated the bulkheads in the construction of its steamer basin; that the appellee had made some use of the bulkheads, but that the use was not such as to entitle the appellant to be reimbursed under the strict wording of the act, since the steamer basin was not a "wharf, or other building in the nature of a wharf, or other harbor structure," nor was the use for a steamer basin included in the phrase "for other wharf purposes."

In view of the waiver of jury trial, the facts as found by the judge have the same effect as though found by a jury. 28 USCA § 773. On the facts as found, we are of the opinion that the court did not err in concluding that the use made by the appellee of the bulkheads in the construction and maintenance of its steamer basin was not within the terms of the act, and that the act did not render the appellee liable for payment for the use of so much of the bulkheads as was not applied to the construction of its two wharves. The District Court, in a careful and painstaking opinion, has analyzed clearly, and discussed fully, all the issues involved. We find no reversible error in its findings of fact or conclusions of law.

The judgment of the court below is affirmed.

BUFFINGTON, Circuit Judge (dissenting).

I am constrained to differ with my colleagues in this all-important case to the city of Philadelphia. The Schuylkill is a navigable river and the exclusive right to its control for the purpose of navigation is in the paramount authority of the United States. With the consent of the United States authorities, the city of Philadelphia entered upon a far-reaching plan of bringing ocean business to the city by making the Schuylkill navigable for ocean vessels of deep draught. The city's object was to eventually provide proper wharf facilities for several miles along the river and the erection by riparian owners, in time, of wharves, making an improvement similar to that made by many European and American cities, where the docks stretch for many miles. With this purpose in view, the city, with the consent of the War Department and under an act of assembly of Pennsylvania, began the construction of a line of bulkheads on each side of the stream for some 5 miles, making a deep vessel harbor along 10 miles of the river's bank. The purpose of these bulkheads was twofold—first, to narrow the channel and confine it between such bulkheads. By thus narrowing the channel, the water of the stream would be accelerated in speed, and the Schuylkill being a very muddy stream and filled with silt, this narrow 5-mile passage would quicken the action of the water coming down from the hinterland and also the action of the tide in rising and falling. The engineering problem was similar to the way in which Eads made scouring channels at the mouth of the Mississippi and thus made it navigable for large vessels. The other purpose was to prevent the silt from the banks of the stream from slipping into it.

The twofold purpose of erecting these parallel bulkheads—it is of interest to note that the name "mud fence" given by the public defined really what these fences were for—was found as a fact by the court in the tenth request, found on page 168 of the record, which reads as follows: "10. The mud fences were erected for the purpose of making it possible for the City to maintain a 30 foot channel in the Schuylkill River, inter alia, in front of the property of the defendant and the mud fence was further intended to prevent the muddy banks of the river from sloughing off into the channel so dredged and to obtain the benefit of the scouring effect of the tidal currents by confining them within permanent walls."

At this point we note that such improvement, which in this case cost the city some two millions of dollars, could not be assessed against riparian owners. It is equally clear that if a riparian owner made use of the bulkhead so constructed by Nation, state, or municipality, he could equitably· and legally be called upon to pay a reasonable amount for his use.

The Standard Oil Company owned a tract of land upon the Schuylkill with practically 1,000 feet of riparian shore length and its tanks are situated upon such tract. Its oil is brought up the river in tank steamers or tank barges. The cargo, of course, is never deposited on a wharf, but through means of a wharf the vessel is held to moorings and the oil is pumped from the tankers or barges as the case may be, without being deposited on the wharf. It is, therefore, clear that the entire property of the Standard Oil Company, with this long river frontage, would be served by pipe lines from the steamer to the tanks, and in this way its entire tract utilized for oil storage, refining, and the like.

With the consent of the city, the oil company put in the two small timber wharves and some dolphins, as described in the majority opinion, and only a small lineal length of the bulkhead was used for a backing for the two wharves. But the wharves are situate outside the navigable channel, and, as the river was constantly depositing silt in front of them and the government was only dredging the channel proper, it is quite clear that to avail themselves of their wharves it was necessary for the oil company to dredge out the silt so brought to its wharves by the action of the stream. The water surrounding the wharf was, of course, subject to the same rapid scouring action of the main channel and the deposit of silt was necessarily less by reason of this scouring action; so also the silt, which would otherwise have been deposited near the wharf by the erosion or falling in of the banks, was measurably lessened by reason of the bulkhead. That the landowner was benefited by the bulkhead and that it availed itself of such scouring and lateral erosion, the court found in its opinion, as follows: "Upon

the fact issue, I find that the mud fence in front of the defendant's property does act substantially (though precisely to what extent I cannot determine) to prevent the muddy banks of the river from sloughing off into the dredged ship basin. It would, no doubt, be physically possible to maintain the ship basin without it, but it would require more frequent dredging and might make the cost prohibitive. In addition, if there were no fence there, the defendant would have to cut its shore further back in order to counteract the tendency of the mud to slide into the basin, by getting a more stable angle of repose for it. On the whole I find, therefore, that the defendant is making use of the mud fence along the entire length of the ship basin."

We, therefore, have the fact established by the findings of fact of the trial judge, who acted as a jury, that defendant was using the entire 1,000-foot front of the bulkhead, for it is quite evident that the lessening of the burden of the oil company's expense of dredging was due in part to the 1,000 feet of bulkhead. Indeed, the result was that as an aid in keeping the whole 1,000 feet of its river front navigable to the extent of 30 feet of clear water and ample space for the maneuvering of its large ocean going steamers and the barges, the bulkheads were necessary and were used. If the defendant simply dredged in front of the 90 feet of its wharves, there would be some reason for saying that the maintenance of such depth was an incident of the right to build a wharf, but it is quite clear that the depth of the water to 30 feet extended the whole length of defendant's property and afforded navigable facilities for handling its vessels, not only for the 90 feet of the wharves' frontage, but for the whole of the space required for the handling of its vessels and gaining approach to the wharves. Without the bulkheads and their action in helping maintain a 30-foot navigable water, the oil company's deep water vessels could not approach its wharves, and their so-called wharves would be wharves in name but not in fact.

It seems to me, therefore, that this riparian owner is making use of this farseeing public work of the city and, making use of it, is equitably and legally bound to pay a just toll or share of its cost, just as it would be if it were a case of an owner using a public sewer or an abutter enjoying a party wall. I, therefore, favor a reversal of this case.