### GETTY REFINING AND MARKETING CO.

#### v.

**M/T FADI B, her engines, tackle, apparel, furniture, equipment, and all other necessaries thereunto appertaining and belonging, In Rem**

#### and

**Fadi Shipping Corporation In Personam.**

Civ. A. No. 81–759.

United States District Court, E.D. Pennsylvania.

Aug. 29, 1984.

---

E. Michael Keating, Philadelphia, Pa., for plaintiff.

Richard W. Palmer, Palmer, Biezup & Henderson, Philadelphia, Pa., for defendant.

## MEMORANDUM OPINION AND ORDER

VANARTSDALEN, District Judge.

Plaintiff Getty Refining and Marketing Co. (Getty) operates a marine terminal at Delaware City, Delaware. This terminal is used primarily for the loading and unloading of crude oil and oil products at Getty's refinery. The M/T Fadi B is an oil tanker owned by defendant Fadi Shipping Corporation (Fadi). On January 12, 1981, the Fadi B sustained a crack in her deck and side hull plating while discharging a cargo of crude oil at Pier 1 of Getty's Delaware City terminal. The source of the crack was a defective weld in the ship's main deck plating. The weld had been put in place in early 1980 during shipyard repairs in Piraeus, Greece. The crack caused neither physical damage to Getty's facilities nor pollution damage to the waters surrounding Getty's terminal. The United States Coast Guard, however, ordered the Fadi B to cease discharging her cargo and to remain at her berth until a safe plan for discharging the balance of the cargo could be developed and implemented. As a result, the Fadi B's cargo operations ceased for over two and one-half days, and the ship was forced to remain moored at Getty's pier until January 17, 1981.

Getty brought the present action to recover damages for the loss of use of its pier during the extra time used by the Fadi B following the cracking of her hull. Getty contends that the defendants are liable for the consequences of the Fadi B's cracking, because the defendants were negligent in failing to inspect the defective weld at the time of the ship's repair in Greece, and later in mooring the Fadi B at Getty's terminal under conditions that foreseeably would result in the cracking of the ship. The damages that Getty seeks to recover as a result of the defendants' negligence consist of the demurrage paid by Getty to several vessels that were scheduled to dock at Getty's terminal, but were delayed in doing so while the Fadi B remained at Getty's pier.

A nonjury trial was held earlier this year. At the close of Getty's evidence, the defendants moved for dismissal of the action pursuant to Federal Rule of Civil Procedure 41(b). The basis for the defendants' motion was that Getty had offered evidence only as to economic injury, and that recovery for purely economic loss is barred as a matter of law by *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927). At the time, I declined to render a judgment, but took the defendants' motion under advisement until the close of all the evidence. At the close

of all the evidence, the defendants renewed their motion. I heard arguments of counsel on the *Robins* issue, and requested additional briefing by the parties. Because the *Robins* issue is dispositive, judgment will be entered in favor of the defendants.[1]

In *Robins*, the operators of a shipyard negligently damaged a ship's propeller while performing repair work on the ship. The damage to the propeller required the ship to remain in drydock for several additional days. A party that had contracted with the owner to charter the ship sued the shipyard for the damages arising from the loss of use of the ship during the time needed to replace the damaged propeller. The Supreme Court held that the time charterer could not recover from the shipyard. Justice Holmes, writing for the court, stated:

> [the time charterer's] loss arose only through [its] contract with the owners—and while intentionally to bring about a breach of contract may give rise to a cause of action, no authority need be cited to show that, as a general rule, at least, a tort to the person or property of one man does not make the tort-feasor liable to another merely because the injured person was under a contract with that other, unknown to the doer of the wrong. The law does not spread its protection so far.

275 U.S. at 308–09, 48 S.Ct. at 135 (citations omitted).

Although the *Robins* court did not articulate a rationale for the rule denying the charterer's claim for the negligent interference with contractual relations, it is generally accepted that the rule reflects a concern for limiting the scope of a defendant's potential economic liability. *See generally*, Restatement (Second) of Torts § 766C, comment a (1979); *Prosser and Keeton on the Law of Torts*, § 129 at 1001 (W.P. Keeton 5th ed. 1984); James, *Tort Liability for Economic Loss*, 25 Vand.L.Rev. 43 (1972). Without such a limitation, a de-

fendant may be exposed to potentially limitless liability, because a single negligent act may affect a multitude of contractual relationships. *Prosser and Keeton* note:

> The policy against recovery based on [negligent interference with contractual relations] is rooted at least in part on what Professor James has called the "pragmatic objection" that while physical harm generally has limited effects, a chain reaction occurs when economic harm is done and may produce an unending sequence of financial effects best dealt with by insurance, or by contract, or by other business planning devices.

*Prosser and Keeton*, § 129 at 1001. By limiting a defendant's exposure for economic losses that arise solely by reason of a contractual relation, the rule against recovery for the negligent interference with the performance of a contract cuts off the chain reaction of financial effects at the first link.

Some courts have extended this policy analysis, and apply *Robins* as authority for a per se rule barring recovery for all negligently inflicted economic losses, where such losses are unaccompanied by physical damage to the plaintiff's person or property. In particular, the Fifth and Eleventh Circuits routinely apply *Robins* to deny recovery where a defendant negligently obstructs the use of a navigable waterway and causes vessel owners, terminal operators, or various other commercial enterprises to lose profits or incur additional expenses. *See, e.g., Louisiana v. M/T Testbank*, 728 F.2d 748 (5th Cir.1984); *Hercules Carriers, Inc. v. Florida*, 720 F.2d 1201 (11th Cir.1983); *Akron Corp. v. M/T Cantigny*, 706 F.2d 151 (5th Cir.1983); *Kingston Shipping Co. v. Roberts*, 667 F.2d 34 (11th Cir.), *cert. denied*, 458 U.S. 1108, 102 S.Ct. 3487, 73 L.Ed.2d 1369 (1982); *Dick Meyers Towing Service, Inc. v. United States*, 577 F.2d 1023 (5th Cir.1978), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1215, 59

---

**1.** Rule 41(b) states that "[i]f the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a)." Fed.R.Civ.P. 41(b). This memorandum represents my findings of fact and conclusions of law in accordance with Rule 52(a).

L.Ed.2d 455 (1979). In *Testbank*, for example, the court stated:

> Building on the Supreme Court's decision in [*Robins*], the Fifth Circuit Court of Appeals has developed a doctrine of maritime law that controls the outcome of this case: in a suit based upon the alleged negligence of a defendant, a plaintiff cannot recover consequential economic losses if the alleged negligence has not caused any physical damage to the person or property of the plaintiff.

728 F.2d at 749–50. Needless to say, application of such a per se rule in the present case would bar Getty from recovering from the defendants, because Getty admittedly has not suffered any physical damage to its facilities.

On the other hand, some courts, led by the Second Circuit's opinion in *In re Kinsman Transit Co.*, 388 F.2d 821 (2d Cir. 1968) (Kinsman II), have expressed dissatisfaction with the negligent breach of contract analysis of *Robins*, and with the per se rule denying recovery for purely economic losses. *See Federal Commerce & Navigation Co. v. M/V Marathonian*, 392 F.Supp. 908 (S.D.N.Y.), *aff'd*, 528 F.2d 907 (1975). *See also Testbank*, 728 F.2d at 750–51 (Wisdom, J., concurring); *Hercules Carriers*, 720 F.2d at 1202–05 (Clark, J., concurring). Although the *Kinsman II* approach recognizes the practical necessity of curtailing unlimited liability, it views the bright line limitations imposed by *Robins* and the per se rule as artificial, and as unreasonably restricting a plaintiff's ability to obtain redress for the consequences of a defendant's negligent conduct. *Kinsman II*, 388 F.2d at 823–24. *See Testbank*, 728 F.2d at 750–51 & n. 1 (Wisdom, J., concurring). This approach advocates the use of traditional tort principles rather than bright line rules. Under this approach, a defendant is held to be liable for all of the economic losses that are proximately caused by his negligent conduct. A court applying the *Kinsman II* approach substitutes principles such as remoteness, foreseeability, and proximate cause to provide the necessary limitation of liability. *Kinsman II*, 388 F.2d at 824–25. *See Venore Transportation Co. v. M/V Struma*, 583 F.2d 708, 710 (4th Cir.1978) (*Robins* "is essentially a principle of disallowing damages because of remoteness...."). *But see, Marathonian*, 392 F.Supp. at 913–16 (although preferring the *Kinsman II* approach, the court applies the *Robins* analysis because bound by precedent).

In the present case, it is neither necessary to rely on the per se rule against recovery of purely economic losses, nor appropriate to apply the *Kinsman II* approach, because the *Robins* analysis directly governs the disposition of Getty's claim. Assuming for purposes of the present motion that the defendants acted negligently,[2] the only injury that Getty has established was its payment of demurrage to several vessels that were delayed while the Fadi B was forced to remain at Getty's pier. Getty's obligation to pay these demurrage claims arose, if at all,[3] from Getty's contracts with each of the delayed vessels.[4] Getty's claim thus essentially is one for interfering with its contracts by requiring it to undertake contractual obligations that made its performance more expensive. Getty admits this much in its brief:

> Getty was under a contractual obligation to pay demurrage to vessels it had under hire. The damages that Getty is seeking consist principally of the excess demur-

---

**2.** Although I have not reviewed all of the evidence, the record contains much evidence tending to establish that Fadi had no duty to inspect the particular weld that caused the crack in the Fadi B, and that a reasonable inspection would not have uncovered the defect in the weld.

**3.** Fadi strenuously maintains that the various provisions in Getty's contracts did not require Getty to pay demurrage under the circumstances of this case.

**4.** Getty had entered into several different types of contractual arrangements with the delayed vessels. Getty chartered the Alabama Getty, Pennsylvania Getty, and Texas Getty under contracts of affreightment with its parent company, Getty Oil Co. Getty hired the Interstate 140 directly from a barge operator, and Getty entered into exchange agreements with the owners and charterers of the Ogden Champion and the Solveig.

rage payments that it was required to make as a result of the FADI B's tortious conduct in blocking Getty's main pier. The FADI B did not interfere with Getty's contractual relationships. Rather, the tortious conduct of the FADI B caused Getty to incur extra expenses which were based upon contact obligations and were of a nature that are well known to any shipowner.[5]

Plaintiff's Memorandum of Law at 6.

Getty seeks to distinguish the present case from *Robins* because the defendants' interference did not result in a *breach* of contract. This distinction is irrelevant. As the Restatement (Second) of Torts illustrates, the interference with contractual relations can take several forms. *See* Restatement, §§ 766–766B. In *Robins*, the shipyard interfered with the contract between the shipowner and the charterer by preventing the shipowner from performing. The charterer's claim thus corresponds to what the Restatement labels "interference with the performance of a contract by a third person." *Id.* at § 766. In the present case, the defendants interfered with Getty's contracts by making the performance of those contracts more burdensome (*i.e.*, incurring demurrage charges to delayed vessels). Getty's claim thus corresponds to what the Restatement labels "interference with another's performance of his own contract." *Id.* at 766A. As the Restatement recognizes, an interference under either circumstance is not actionable if it was done negligently. *Id.* at 766C. Because Getty seeks only to recover economic losses resulting from the negligent interference with its own contracts, Getty's claim is barred as a matter of law by the holding of *Robins*.

Applying *Robins* in the context of this case not only is consistent with precedent, it is also consistent with the pragmatic policy of limiting the scope of liability for economic losses. In fact, the case exemplifies the "chain reaction" of economic effects to which *Prosser and Keeton* refer. Because of an apparent shortage of crude oil at its refinery, Getty scheduled several ships to arrive at the Delaware City anchorage within a relatively short time span. These incoming ships were prevented from mooring at Getty's terminal for a time by the circumstances surrounding the cracking of the Fadi B. Each succeeding ship that arrived at the breakwater was delayed from proceeding to Getty's terminal. Getty added together the economic consequences of this chain reaction of delays, and presented them to the defendants as a claim for damages. The evidence at trial extended to at least eight different vessels. The liability to the defendants conceivably could have been endless, and was dependent upon Getty's own scheduling decisions. The testimony of the various scheduling witnesses, and the charts each prepared, proved, if anything, that to isolate accurately the delays that are fairly attributable to the Fadi B is a nearly impossible task. *Robins* sensibly avoids the uncertainties inherent in such an undertaking.

---

**5.** Getty asserts that *Robins* does not apply because Getty had a proprietary interest in the blocked pier. *See Vicksburg Towing Co. v. Mississippi Marine Transport Co.,* 609 F.2d 176 (5th Cir.1980). As the quoted passage demonstrates, however, Getty's claim for damages does not arise by reason of its ownership of the pier as such, but rather because Getty entered into contractual arrangements whereby it hired vessels to deliver crude oil to its refining facility. The interference, therefore, was with Getty's contractual rights and interests, not with proprietary rights and interests.