766 F.2d 829
 1985 A.M.C. 2579
 GETTY REFINING AND MARKETING COMPANY, Appellant,
v.
MT FADI B, her engines, tackle, apparel, furniture,
equipment and all other necessaries there unto
appertaining and belonging In Rem
and
Fadi B Shipping Corp. In Personam.
 No. 84-1567.
 United States Court of Appeals,
Third Circuit.
 Argued March 25, 1985.
Decided July 11, 1985.
 
 E. Michael Keating, III (Argued), W. Stanley Sneath, Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for appellant.
 Michael B. McCauley (Argued), Richard W. Palmer, Todd C. Atkinson, Palmer Biezup & Henderson, Philadelphia, Pa., for appellees.
 Before ALDISERT, Chief Judge, and SLOVITER and MANSMANN,* Circuit Judges.
 OPINION OF THE COURT
 ALDISERT, Chief Judge.
 
 
 1
 This appeal by Getty Refining and Marketing Company from judgment entered in favor of M/T FADI B and Fadi Shipping Corp. requires us to decide whether, in the absence of physical damage, appellant may recover economic loss sustained when it had to pay contractual obligations to third parties by reason of the negligence of the FADI B. The district court applied the teachings of Robins Dry Dock & Repair Co. v. Flint, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927), and held that economic loss could not be recovered if the tortious interference with a contract was not intentional, but only negligent. We affirm.
 
 I.
 
 2
 Appellant operates a marine terminal at its refining facility at Delaware City, Delaware. On January 11, 1981, the oil tanker, FADI B, docked at Pier 1 at 7:00 a.m. Discharge of its oil cargo commenced at 11:20 a.m. and continued for the remainder of that day and into the morning of the following day, when at 7:00 a.m., a crack was discovered in the ship's deck and hull. Upon being discovered by the vessel's crew members, cargo discharge was stopped. Approximately three hours later the United States Coast Guard ordered the FADI B to cease cargo operations and ordered the vessel to remain at her berth until such time as a safe plan for discharging the balance of the cargo could be implemented. Pursuant to the express authorization of the Coast Guard, and in accordance with a plan developed by the vessel's classification society, cargo discharge resumed and was completed on January 17 at 10:55 a.m. The vessel then departed from the dock. Interruption of the cargo discharge extended for a period of two days, 13 hours and 15 minutes. It was determined that a defective weld in the main deck plating, welded in early spring 1980 in Piraeus, Greece, caused the crack. The parties have stipulated that the cessation of cargo discharge "did not cause any physical damage to the dock or marine terminal nor any pollution of the adjoining waters." Stipulation of Fact No. 22, app. at 17.
 
 
 3
 At trial and before this court appellant claims damages "as a result of the negligence of FADI." Brief for Appellant at 3. Appellant claims as damages demurrage it was obligated to pay to other vessels that were scheduled to dock at its pier during and immediately after the FADI B's crack was discovered. Additionally, appellant seeks recovery of expenses incurred in rescheduling those vessels that were preparing to dock at its terminal, but were unable to do so at the scheduled times.[1] At trial most of the facts were stipulated and apparently are not controverted on appeal. The district court found as a matter of law that under Robins an action for negligence may not be maintained for interference with contractual relations and granted the motion to dismiss under Rule 41(b), Federal Rules of Civil Procedure.[2]
 
 II.
 
 4
 Appellant asserts that the district court incorrectly construed Robins, contending that the Robins Court did not establish a per se rule foreclosing recovery in all negligence actions when no physical damage has occurred. Specifically, appellant argues that the district court erred in characterizing appellant's cause of action as negligent interference with contractual relations. Appellant argues that the Robins rule does not apply to the facts of this case because appellant had both a property right in its blocked pier and a special relationship with the FADI B. Because this issue involves the interpretation and application of legal precepts, our review is plenary. Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 102-03 (3d Cir.1981).
 
 III.
 
 5
 In Robins, a time charterer of a vessel sued for profits lost when the defendant dry dock negligently damaged the vessel's propeller. The propeller had to be replaced, thus extending by two weeks the time the vessel was laid up in dry dock, and it was for the loss of the use of the vessel for that period that the charterer sued. In denying recovery, and speaking through Justice Holmes, the Court noted:
 
 
 6
 [N]o authority need be cited to show that, as a general rule, at least, a tort to the person or property of one man does not make the tortfeasor liable to another merely because the injured person was under a contract with that other, unknown to the doer of the wrong.... The law does not spread its protection so far.
 
 
 7
 275 U.S. at 309, 48 S.Ct. at 135 (citation omitted). The Court of Appeals for the Fifth Circuit has reminded us that "Robins broke no new ground but instead applied a principle, then settled both in the United States and England, which refused recovery for negligent interference with 'contractual rights'." State of Louisiana ex rel. Guste v. M/V TESTBANK, 752 F.2d 1019, 1022 (5th Cir.1985) (in banc).
 
 
 8
 Three cases cited by Justice Holmes in Robins deserve examination because they show the historical underpinnings of the Robins rule: Elliott Steam Tug Co. v. The Shipping Controller, [1922] 1 K.B. 127; Byrd v. English, 117 Ga. 192, 43 S.E. 419 (1903); The Federal No. 2, 21 F.2d 313 (2d Cir.1927). In Elliott Steam Tug, the British admiralty, under wartime legislative powers, requisitioned a tug. A charterer of the tug lost profits because of the requisitioning. In applying an indemnity statute that authorized recovery, the court noted that the charterer could not have recovered at common law, stating: "The charterer in collision cases does not recover profits, not because the loss of profits during repairs is not the direct consequence of the wrong, but because the consumer law rightly or wrongly does not authorize him as able to sue for such an injury to his mere contractual rights." 1 K.B. at 140. In Byrd v. English, the defendant negligently damaged a utility's electrical conduits, thus cutting off power to the plaintiff's printing plant. The plaintiff sued for lost profits because of loss of power, and the court denied recovery. Finally, in The Federal No. 2, the defendant tug negligently injured plaintiff's employee while he was working on a barge. The employer sued to recover sums paid to the employee in maintenance and cure. The court denied recovery and explained: "It is too indirect to insist that this may be recovered, where there is neither the natural right nor a legal relationship between the appellant and the tug, even though the alleged right of action be based upon negligence." 21 F.2d at 314.
 
 IV.
 
 9
 Significantly, the Supreme Court decided Robins, announcing a bright line rule of limitation, against a backdrop of general judicial expansion of tort liability in negligence, demonstrated most graphically by Judge Cardozo's milestone decision, ten years earlier, in MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050 (1916) (destroying the sacrosanct notion of privity in recoveries based on negligence). The Robins rule, however, has withstood the test of time. It has been followed by courts and embraced by commentators. The rule has been reaffirmed by the Restatement of Torts (Second):
 
 
 10
 One is not liable to another for pecuniary harm not deriving from physical harm to the other, if that harm results from the actor's negligently
 
 
 11
 (a) causing a third person not to perform a contract with the other, or
 
 
 12
 (b) interfering with the other's performance of his contract or making the performance more expensive or burdensome, or
 
 
 13
 (c) interfering with the other's acquiring a contractual relation with a third person.
 
 
 14
 Restatement (Second) of Torts Sec. 766C (1977).
 
 
 15
 The Restatement's drafters report that it is the character of the contract or prospective interest itself that has led courts to refuse to give the interest protection against negligent interference. Id. comment a. The extremely variable nature of the relations between the parties, the fear of an undue burden upon the defendant's freedom of action, the probable disproportion between the large damages that might be recovered and the extent of the defendant's fault, and perhaps in some cases the difficulty of determining whether the interference has in fact resulted from the negligent conduct, all have influenced the courts against permitting recovery. Id. "Whatever the reason may be, there is as yet no general recognition of liability for negligent interference with an existing contract or with a prospective contractual relation, although a number of cases, scattered through the years, have held that liability should be imposed." Id.
 
 
 16
 The courts today, with the exception of one or two isolated cases,[3] have adopted a bright line rule that precludes recovery of the loss of financial benefits of a contract or of prospective trade because of negligent interference with a contractual relationship absent physical damage or injury. The courts have discarded traditional tort precepts of foreseeability and lack of remoteness in this limited class of cases. Professors Prosser and Keeton set forth a recent explanation of the rule:
 
 
 17
 The policy against recovery based on negligence is rooted at least in part on what Professor James has called the "pragmatic" objection, that while physical harm generally has limited effects, a chain reaction occurs when economic harm is done and may produce an unending sequence of financial effects best dealt with by insurance, or by contract, or by other business planning devices. The courts have generally followed this policy and the rather limited and narrow exceptions have had virtually no impact on the law.
 
 
 18
 W. Prosser & W. Keeton, The Law of Torts 1001 (5th Ed.1984). The commentators have hinted that one historical justification for the rule is that interference with contract had its modern inception in "malice," and thus has remained essentially an intentional tort: "In general, liability has not been extended to the various forms of negligence by which performance of a contract may be prevented or rendered more burdensome." Id. at 997.[4]
 
 
 19
 Moreover, as recently emphasized, "retention of this conspicuous bright line rule in the face of the reforms brought by the increased influence of the school of legal realism is strong testament both to the rule's utility and to the absence of a more 'conceptually pure' substitute." M/V TESTBANK, 752 F.2d at 1023 (footnote omitted). We recognize that a plausible argument can be advanced that it was entirely foreseeable that appellant would have a flotilla of ships scheduled to berth at its pier. An experienced oil tanker company like Fadi knew or should have known the scheduling at discharge points is a common occurrence and that ships like the INTREPID, for example, would have specific schedules based on a normal discharge time at the appellant's pier. But the courts and the commentators respond that the long established rule, reaffirmed in Robins and incorporated into the modern Restatement and embraced by the commentators, is a pragmatic limitation imposed by the court upon the tort doctrine of foreseeability. Concededly, we are drawing a fine line, but this approach has the virtue of what Holmes called "predictability" and Llewellyn, "reckonability," by saying that the law shall go thus far and no further.[5]
 
 
 20
 Absent drawing the line where it now is, a court could plausibly decide that wave upon wave of successive economic consequences were foreseeable. If, for example, the INTREPID, delayed in Delaware, was unable to fulfill its obligation to perform a contract of freightment at its next port of call, the shipper of that next cargo could suffer injury and its receiver, customers of the receiver, and their customers as well might suffer damage. In a different context, Cardozo stated the concern that extending liability under these circumstances would be "liability in an indeterminate amount for an indeterminate time to an indeterminate class." Ultramares Corp. v. Touche, 255 N.Y. 170, 179, 174 N.E. 441, 444 (1931).
 
 
 21
 We emphasize, of course, that the rule under discussion applies when the plaintiff suffers only pecuniary loss such as the claim here. Clearly, a plaintiff may recover for negligence that results in physical harm to his person or land or chattels and causes pecuniary loss because of the nonperformance of a contract with him. Under those circumstances, the physical injury forms the basis of a tort independent of any contractual interests and recovery is subject to the usual rules governing liability for negligence.
 
 
 22
 Accordingly, we will adhere to the rule defined by Justice Holmes in Robins, incorporated in the Restatement of Torts (Second) Sec. 766C, and embraced by the leading commentators that where the negligence does not result in physical harm, thereby providing no basis for an independent tort, and the plaintiff suffers only pecuniary loss, he may not recover for the loss of the financial benefits of a contract or prospective trade. By so holding we align ourselves with numerous other courts that have interpreted and applied the teachings of Robins.[6]
 
 V.
 A.
 
 23
 Faced with such formidable authority appellant argues that the district court mischaracterized its complaint as alleging negligent interference with contractual relations.[7] 7] We disagree. The only injury appellant established before the district court was the payment of demurrage charges to several vessels that were delayed due to the FADI B's extended stay at appellant's pier. It is clear that appellant incurred these damages solely because of its contractual relations with the various vessels. Similarly, any incidental expense incurred by appellant in rescheduling those delayed vessels into its pier arose from obligations appellant assumed by contract. Appellant's damages thus flow from its contractual duties; appellant has not established any damages arising by reason of its property right in the dock itself. Accordingly, the district court properly concluded that appellant's claim was essentially one for negligent interference with performance of contracts. Construed as such, the claim falls squarely within the prohibition of Robins.
 
 B.
 
 24
 Appellant also contends that the Robins rule does not apply because a special relationship existed between it and the FADI B. Apparently, appellant argues that the presence of the ship at the pier was an improper interference with appellant's riparian rights. It argues that as an owner of riparian land it had the right of access to the navigable water immediately in front of its property and also a right of access to the whole body of navigable water connected with the water in front of this property; that although the riparian landowner does not own the water in front of his property and must share that water with the public, its right of access is a property interest that is an accessory to its land ownership. From these assertions appellant constructs the theory that it has suffered an invasion of this property interest by the negligence of the FADI B and that this invasion created liability.
 
 
 25
 However innovative this theory may be, certain observations are compelled. First, appellant did not clearly assert this theory in its complaint. Second, assuming the theory was properly pleaded, appellant does not contend that the alleged invasion was intentional, but concedes that it was negligent. Third, howsoever appellant describes the act of negligence, we are left with the brute fact that there was no physical damage to a person, chattel, or real property. Fourth, no persuasive court precedent or academic authority substantiates appellant's theory of recovery under the circumstances presented here. We cannot conclude that the contention is consistent with or is coherent with the body of negligence law.
 
 
 26
 Additionally, the cases upon which appellant relies to support its riparian rights theory do not contradict the strong judicial precedent against recovery for purely economic harm where the cause of action sounds in negligence, as appellant's complaint obviously does. Thus, in City of Philadelphia v. Standard Oil Co., 12 F.Supp. 647 (E.D.Pa.1934), aff'd 79 F.2d 764, cert. denied, 297 U.S. 705, 56 S.Ct. 443, 80 L.Ed. 992 (1935), the court held that a riparian landowner need not pay for the use of a retaining wall along the river where his land abutted after he dredged the river in front of the wall. 12 F.Supp. at 649-50. This case turned on statutory construction, not riparian owner rights, and did not involve a negligent act. In City of Philadelphia v. Commonwealth, 284 Pa. 225, 130 A. 491 (1925), negligence also was not involved. The court simply decided that a state commission established to build a bridge across the Delaware River could appropriate--with just compensation--the property rights of riparian owners. Id., 130 A. at 493.
 
 
 27
 Appellant also mischaracterizes the holdings of several cases that it cites for support of its statement: "If a landowner's riparian access is blocked, he has a cause of action against the offending party for whatever damages he can prove, be they economic or otherwise." Brief for Appellant at 24. The cases cited either do not support this principle or can be distinguished from the issue presented here. See Sound Marine & Machine Corp. v. Westchester County, 100 F.2d 360 (2d Cir.1938), cert. denied, 306 U.S. 642, 59 S.Ct. 582, 83 L.Ed. 1042 (1939), on remand 45 F.Supp. 980 (S.D.N.Y.1942) (diminished rental value of pier allowed as damage for improper placement of underwater pipeline; however, negligence not involved); United States v. Pennsylvania Salt Manufacturing Co., 30 F.2d 332 (3d Cir.1929) (court denied an injunction requested by the lessor of an adjoining pier to deny a wharf owner access to his wharf--court did not address economic damages); Kohlasch v. New York State Thruway Authority, 516 F.Supp. 769 (S.D.N.Y.1981) (court held statute of limitations barred any action for placement of pipeline--court did not discuss negligence or damages); In re Boat Demand, Inc., 174 F.Supp. 668 (D.Mass.1959) (economic damages for loss of use of pier allowed; however, case involved physical injury to both pier and buildings thereon); D'Albora v. Garcia, 144 So.2d 911 (La.Ct.App.1962) (court enforced an injunction barring one riparian owner's intentionally blocking another's use of a navigable canal--intentional conduct involved, court did not discuss economic damages). In The Jamaica, 51 F.2d 857 (W.D.N.Y.1926), on reh'g, 51 F.2d 858 (W.D.N.Y.1931), although the court allowed recovery by the owner of a steamer that was negligently blocked from exiting its slip, this case did not involve riparian rights and clearly goes against the weight of subsequent authority denying recovery for negligence without physical damage.
 
 
 28
 Finally, the only case which supports this theory for appellant's recovery is Sinclair Refining Co. v. Smith, 13 F.2d 68 (5th Cir.1926). In that case, because the court allowed recovery for economic loss on the basis of negligence alone, the subsequent Supreme Court decision in Robins, a year later, and the more recent Fifth Circuit cases barring recovery under such circumstances have virtually eliminated any precedential value to its holding. See, e.g., M/V TESTBANK, 752 F.2d 1019. Therefore, even if appellant had proceeded under this theory in the district court, the result here would be the same.
 
 VI.
 
 29
 At oral argument, appellant seemed to anchor its entire case on the theory of a negligent invasion of its proprietary interest in a riparian right. Near the conclusion of the argument the following colloquy took place between the court and counsel for appellant:
 
 
 30
 THE COURT: [I]f we do not accept your notion that there was a proprietary interest that was invaded, where are you?
 
 
 31
 MR. KEATING: I think if I have no proprietary interest, unless, your Honors wish to overrule Robins, I'm out of court.
 
 
 32
 Transcript of oral argument at 32. The short answer in this case is that a court of appeals has no power to overrule a decision of the Supreme Court. Moreover, we do not have any inclination to tinker with a long-standing rule that has received the support of the courts and the commentators.
 
 
 33
 The judgment of the district court will be affirmed.
 
 
 34
 MANSMANN, Circuit Judge, dissenting.
 
 
 35
 This case requires the court to decide whether the district court properly dismissed the appellant's action pursuant to Federal Rule of Civil Procedure 41(b) following the close of evidence in a nonjury trial. My reading of the facts in evidence leads me to conclude that the district court's holding that "the Robins analysis directly governs the disposition of Getty's claim" is error. Getty Refining & Marketing Co. v. M/T FADI B, 595 F.Supp. 452, 455 (E.D.Pa.1984) (hereinafter "Getty") (citing Robins Dry Dock & Repair Co. v. Flint, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927) (hereinafter "Robins")). Because I would rely on traditional tort principles rather than the bright line rule advocated by the majority, I would reverse and remand the case.
 
 
 36
 * The trial court preliminarily ruled that the appellant's cause of action for the negligent blocking of its pier was a claim for negligent interference with contract as set forth in section 766C of the Restatement (Second) of Torts (1977). The court reasoned:
 
 
 37
 Assuming for purposes of the present motion that the defendants acted negligently, the only injury that Getty has established was its payment of demurrage to several vessels that were delayed while the Fadi B was forced to remain at Getty's pier. Getty's obligation to pay these demurrage claims arose, if at all, from Getty's contracts with each of the delayed vessels. Getty's claim thus essentially is one for interfering with its contracts by requiring it to undertake contractual obligations that made its performance more expensive.
 
 
 38
 Getty, 595 F.Supp. at 455. Absent physical injury, ruled the court, the appellant's claim for economic losses stemming from this negligent interference was "barred as a matter of law by the holding of Robins." Id. at 456.
 
 
 39
 The Robins holding is not as broad as the district court suggests. In Robins, a vessel had been time-chartered by the plaintiffs. The owners, who remained in possession of the ship, docked the vessel with the defendant pursuant to a charter provision requiring docking every six months and suspension of payments by plaintiffs to the owners during that period. The ship was injured by the defendant's negligence, and the necessary repairs caused a two week delay in returning the ship to service. The defendant, which "had no notice of the charter party until the delay had begun," "settled with the owners" and "received a release of all their claims." Robins, 275 U.S. at 307, 48 S.Ct. at 135. The charterers of the ship sued the defendant dry dock "in a cause of contract and damage." Id.
 
 
 40
 The Supreme Court of the United States considered theories of recovery in contract and in tort. The Court summarily rejected all rationale for a contract claim, concluding that the plaintiffs were not parties or third-party beneficiaries to a contract with the defendant. The Court then considered the theory of recovery in tort founded on the plaintiffs' alleged " 'property right' in the vessel." Id. at 308, 48 S.Ct. at 135. "The question is," declared the Court, "whether the respondents have an interest protected by the law against unintended injuries inflicted upon the vessel by third persons who know nothing of the charter." Id. The Robins Court concluded that any such interest "must be worked out through their contract relations with the owners, not on the postulate that they have a right in rem against the ship." Id. The court announced:
 
 
 41
 [N]o authority need be cited to show that, as a general rule, at least, a tort to the person or property of one man does not make the tortfeasor liable to another merely because the injured person was under a contract with that other, unknown to the doer of the wrong.
 
 
 42
 Id. at 309, 48 S.Ct. at 135.
 
 
 43
 There are fundamental distinctions between the Robins holding and the facts of the instant case. First, in Robins there was physical injury to the boat. Robins, therefore, does not establish a per se prohibition of recovery where there has been no physical injury to the property. Second, the Court merely found that the plaintiffs had no property interest in the boat and concluded that any contractual relationship with the owners was an insufficient interest in the property to entitle them to recover from defendant. Essentially, the Robins Court found that the defendant owed no duty to the plaintiffs: "Of course the contract of the petitioner [defendant dry dock] with the owners imposed no immediate obligation upon the petitioner to third persons." Robins, 275 U.S. at 308, 48 S.Ct. at 135. In the instant case, it is the owner of the dock (the allegedly injured property) who has sued the alleged tortfeasors. If there had been physical injury to the dock, as in Robins, it could not be said that the instant defendants owed no duty to the plaintiff.
 
 
 44
 Judge Clark, confronting a case similar to the one at bar, explained the inapplicability of the Robins holding.
 
 
 45
 In Robins and Byrd [v. English, 117 Ga. 192, 43 S.E. 419 (1903) ], plaintiff A was in contract with party B, who failed to deliver contracted for benefits to A because of interference from tortfeasor C. Since A's injury resulted from B's failure to perform his contractual obligations, A's remedy, if any, is against B on the contract, and not against C, who cannot be touched for want of privity. The instant case, however, is solely a matter of tort. There is only plaintiff A who has suffered economic loss at the hands of tortfeasor C. There is no party B, no contract upon which A might base a claim for recovery, and no privity bar to an action against C.
 
 
 46
 Hercules Carriers, Inc. v. Florida, 720 F.2d 1201, 1203 (11th Cir.1983) (Clark, J., concurring specially and suggesting rehearing en banc ), aff'd by an equally divided court on rehearing en banc, 728 F.2d 1359 (11th Cir.) (per curiam ), cert. denied --- U.S. ----, 105 S.Ct. 128, 83 L.Ed.2d 69 (1984). "In short, the relationship between the parties in Robins is fundamentally different." Id. While the Robins holding would preclude those who contracted with the appellant from proceeding against the appellee, it does not prohibit the instant suit. Accord J. Ray McDermott & Co. v. SS EGERO, 453 F.2d 1202, 1204 (5th Cir.1972) ("Robins does not stand for the proposition that no one may recover damages suffered or liabilities incurred by virtue of a contract when a ship is tortiously detained.")
 
 
 47
 Not only is the Robins holding inapplicable to the litigation at bar, but the cases cited by Justice Holmes in Robins as "good statement[s]" of the holding, likewise, do not govern the instant suit. See Robins, 275 U.S. at 309, 48 S.Ct. at 135 (citing Elliott Steam Tug Co. v. The Shipping Controller, 1 K.B. 127, 139-40 (1922); Byrd v. English, 117 Ga. 192, 43 S.E. 419 (1903); The Federal No. 2, 21 F.2d 313 (2d Cir.1927)). Unlike the instant case, all three cases cited by Justice Holmes involve the type of third-party participation found in Robins.
 
 
 48
 In Elliot Steam Tug, the plaintiffs had chartered a tug which was subsequently requisitioned by the government. The court noted that, at common law, the charterers would not be entitled to loss of profits.
 
 
 49
 In case of a wrong done to a chattel the common law does not recognize a person whose only rights are a contractual right to have the use or services of the chattel for purposes of making profits or gains without possession of or property in the chattel.
 
 
 50
 Elliott Steam Tug, 1 K.B. at 139 (Scrutton, L.J.). The court noted, however, that "the shipowner suing a wrongdoer for temporary loss of the ship's services would be entitled at common law to recover the loss of profits during that period as a direct consequence of the wrong." Id. at 140. Thus, the court's discussion of the charterer's inability "to sue for such an injury to his merely contractual rights," refers not to a prohibition on the recovery of "loss of profits" but to the nature of the plaintiffs' interest in the injured chattel. Id. Elliott Steam Tug supports the Robins proposition that one whose interest in an allegedly injured chattel is contractual cannot recover from the tortfeasor although the same party may have a right in contract against the owner of the chattel.
 
 
 51
 In Byrd, the defendant's negligence was alleged to have damaged a utility company's conduits, thus cutting off power to the plaintiff's printing plant. The Byrd court noted that "[i]t is only the proximate injury that the law endeavors to compensate." Byrd, 43 S.E. at 421. The Byrd court held that the plaintiff, as a party who was injured by the failure of the other party to comply with the terms of a contract, could not recover damages for the negligent act of a third person which rendered performance of the contract impossible. Byrd, like Robins, involves physical damage as well as a plaintiff who is a third-party to the tort. The Byrd court did not preclude the possibility that the utility company might recover from the defendant "any sums which the company was compelled to pay in damages to its customers." Id. at 420.
 
 
 52
 In The Federal No. 2, the employer of a seaman was not permitted to recover from the tortfeasor for the "cost of cure" although the employer was obliged to pay those expenses by contract and by the law of the ship. The court held that "[t]he tug [the alleged tortfeasor] owed no legal duty to the appellant with reference to its contractual rights with the seaman." The Federal No. 2, 21 F.2d at 313. While the court acknowledged that "[t]he seaman had a cause of action against the tug for negligence," the court concluded that "[i]t is too indirect to insist that [the hospital bills and maintenance] may be recovered, where there is neither the natural right nor legal relationship between the appellant and the tug." Id. at 313-14. The court found that the tort was too remote from the plaintiff's obligation to allow recovery. The holding of The Federal No. 2 was summarized as follows:
 
 
 53
 [O]rdinarily damage suffered by one whose interest in the party or thing injured is contractual is too remote for recovery, unless the wrong is done with intent to affect the contractual relations.
 
 
 54
 Id. at 314 (emphasis added). The holding in The Federal No. 2 does not differ from that of Robins, Elliot Steam Tug, or Byrd.
 
 
 55
 These cases deal essentially with cutting off chains of causation beyond the two parties involved in the tort based on a policy of insuring proximate injury and avoiding remoteness. All four cases discussed above involve physical injury, but the "owner" of the "item" injured is not the plaintiff seeking recovery. As I read them, none of these cases, including Robins, stands for the proposition that the alleged victim is prohibited from recovering in the absence of physical injury. Contrary to the district court's holding, neither Robins nor the cases cited by the Robins Court bars the plaintiff's claim as a matter of law. I would find that the district court's holding that Robins directly governs this case is error.
 
 II
 
 56
 Before reaching its decision of Robins' applicability, the district court discussed two conflicting approaches to claims for economic loss. The majority relies on one of these approaches: a bright line rule precluding recovery for "negligent interference with contract." I would adopt the second approach and apply traditional concepts of foreseeability and proximate cause.
 
 
 57
 The bright line approach extends Robins to preclude "recovery for economic loss if that loss resulted from physical damage to property in which [the plaintiff] had no proprietary interest." Louisiana ex rel. Guste v. M/V TESTBANK, 752 F.2d 1019, 1022 (5th Cir.1985) (en banc ) (citations omitted) (hereinafter "TESTBANK "). The alternative is to rely on traditional tort principles of proximate cause and foreseeability. This court has not heretofore adopted the bright line rule. But cf. In re S.C. Loveland Co., 170 F.Supp. 786, 792 (E.D.Pa.1959) (implicitly requiring physical injury absent intentional interference).
 
 
 58
 The rule has caused some controversy in other circuits. The Courts of Appeals for the Fifth and Eleventh Circuits have embraced the bright line rule. See, e.g., Akron Corp. v. M/T CANTIGNY, 706 F.2d 151 (5th Cir.), reh'g denied, 711 F.2d 1054 (5th Cir.1983); Kingston Shipping Co. v. Roberts, 667 F.2d 34 (11th Cir.), cert. denied, 458 U.S. 1108, 102 S.Ct. 3487, 73 L.Ed.2d 1369 (1982). Both courts, however, have recently reconsidered the advisability of the bright line test en banc. The United States Court of Appeals for the Fifth Circuit voted in a 10 to 5 decision to retain the rule, although a number of the jurists expressed doubt about the absoluteness of the physical injury requirement. TESTBANK, 752 F.2d at 1034-35, 1053 (uncertainty about physical injury requirement expressed by Garwood, J., concurring, and by Rubin, J., dissenting). The United States Court of Appeals for the Eleventh Circuit was equally divided as to whether to affirm or to reverse and, consequently, affirmed the district court's decision, which utilized the bright line rule, by operation of law. Hercules Carriers, Inc., 728 F.2d at 1359.
 
 
 59
 The United States Court of Appeals for the Sixth Circuit, after reviewing case law in search of an "overriding domestic policy translated into law" which would preempt application of Canadian law, "conclude[d] that there is no absolute rule either in Canada or the United States which forbids recovery for economic loss where the claimant has suffered no physical injury." Bethlehem Steel Corp. v. Marriott Corp., 631 F.2d 441, 447, 448 (6th Cir.1980) (citation omitted), cert. denied, 450 U.S. 921, 101 S.Ct. 1370, 67 L.Ed.2d 349 (1981). The United States Court of Appeals for the Second Circuit rejected outright the bright line approach "prefer[ing] to leave the rock-strewn path of 'negligent interference with contract' for more familiar tort terrain." Kinsman Transit Co. v. City of Buffalo, 388 F.2d 821, 824 (2d Cir.1968) (hereinafter "Kinsman II"). The Kinsman II court reasoned:
 
 
 60
 [W]e hesitate to accept the "negligent interference with contract" doctrine in the absence of satisfactory reasons for differentiating contractual rights from other interests which the law protects.
 
 
 61
 Id. at 823.
 
 
 62
 The conflict among the courts revolves around the policy debate concerning the merits of bright line tests versus the merits of case-by-case analysis. The bright line approach is a "pragmatic" attempt to thwart a "chain reaction" of economic injuries which "may produce an unending sequence of financial effects best dealt with by insurance, or by contract, or by other business planning devices." W. Keeton, D. Dobbs, R. Keeton, D. Owen, Prosser and Keeton on The Law of Torts Sec. 129, at 1001 (5th ed. 1984). "The result" of the case-by-case approach, we are told, "would be that no determinable measure of the limit of foreseeability would precede the decision on liability." TESTBANK, 752 F.2d at 1028. The drafters of the Restatement indicate that the courts applying the bright line approach "have been influenced by the extremely variable nature of the relations, the fear of an undue burden upon the defendant's freedom of action, the probable disproportion between the large damages that might be recovered and the extent of the defendant's fault, and perhaps in some cases the difficulty of determining whether the interference has in fact resulted from the negligent conduct." Restatement (Second) of Torts Sec. 766C comment a (1977).
 
 
 63
 The potential difficulties of applying a case-by-case approach referred to by the commentators are not unique to the class of economic injuries. As Judge Wisdom explained in his dissent in TESTBANK:
 
 
 64
 [T]his criticism of "foreseeability" as the criterion for judgment applies with equal force to well-established tort law for physical injury. The unquestioned concepts of foreseeability and proximate cause as established in Palsgraf [v. Long Island R.R. Co., 248 N.Y. 339, 162 N.E. 99 (1928)] and its progeny are open to the same condemnation.
 
 
 65
 TESTBANK, 752 F.2d at 1051-52 n. 38 (Wisdom, J., dissenting). The decisions which the advocates of the bright line approach fear are decisions which are made by the courts every day in numerous contexts. Accord id. at 1051-52. The bright line rule must be adopted only if it can be said that the courts are not capable of sifting through the various relations of the parties, of determining whether proximate cause exists, and of placing some adjudicative limit via the concept of foreseeability on the chain reaction of injuries. Judge Kaufman addressed this question and concluded:
 
 
 66
 The argument[s], frequently heard, that to allow recovery in such instances would impose a penalty far out of proportion to the defendant's fault or open the field to collusive claims and increased litigation, see Prosser, The Law of Torts, 964 (3d ed. 1964), . . . are the spectres commonly raised whenever the law extends its protection. Here, as elsewhere, the answer must be that courts have some expertise in performing their almost daily task of distinguishing the honest from the collusive or fraudulent claim. And "[i]f the result is out of all proportion to the defendant's fault, it can be no less out of proportion to the plaintiff's entire innocence." Id. at 296.
 
 
 67
 Kinsman II, 388 F.2d at 823.
 
 
 68
 Likewise, concerns about unlimited liability and limited funds are unwarranted. Courts demonstrate daily their ability to place limits on liability and to resolve cases in which valid claims surpass available funds. In the context of maritime torts, the courts are aided by statutory procedures to limit the extent of vessel owners' liability. See 46 U.S.C. Secs. 181-195.
 
 
 69
 The concerns raised by the bright line advocates must be viewed in light of the artificial and often inequitable results of the application of the rule. An example used by Judge Wisdom illustrates the point.
 
 
 70
 [I]f a vessel negligently crashes into one marina and then sinks, thereby blocking all access to another marina, the first marina may recover all of its consequential economic losses, but the second may not.
 
 
 71
 Louisiana ex rel. Guste v. M/V TESTBANK, 728 F.2d 748, 750 n. 1 (5th Cir.1984) (Wisdom, J., concurring specially and suggesting rehearing en banc ), aff'd on rehearing en banc, 752 F.2d at 1019, 1032. Indeed, the court handling the claims of the physically damaged marina would confront many of the difficulties that would face a court handling the claim of the marina which was not physically damaged. To prohibit absolutely any recovery for negligence where there is no physical injury is inconsistent with principles of equity and contrary to the increasing willingness of the courts to allow such recovery absent physical injury. See e.g., Holcomb Const. Co. v. Armstrong, 590 F.2d 811, 813 (9th Cir.1979) (complaint alleging negligent entrustment resulting in obstruction of bridge and making performance of contract more expensive was sufficient to state a cause of action); Union Oil Co. v. Oppen, 501 F.2d 558, 566-70 (9th Cir.1974) (permitting recovery for oil spill causing harm to commercial fishermen); Consolidated Edison of New York, Inc. v. Westinghouse Elec. Corp., 567 F.Supp. 358, 364 (S.D.N.Y.1983) (permitting "suit for negligent performance of contractual duties ... where only economic injury is alleged").
 
 
 72
 While it is preferable to avoid the bright line rule, the instant case can also be viewed as falling within the exception to the rule outlined by Prosser and Keeton.
 
 
 73
 But the rule is not addressed at all to the case in which some independent tort to the plaintiff causes an interference with contract. In such cases the plaintiff may recover damages for the tort, including damages for the interference with contract if it is a proximate result. This is not because negligent interference is actionable, but because the interference is an item of damages resulting from some other tort.
 
 
 74
 W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser and Keeton on The Law of Torts Sec. 129, at 997 (5th ed. 1984). The negligence of the appellees in blocking the dock (which we assume for purposes of reviewing this issue) is the independent tort. That tort caused certain injury to appellant, including the contractual requirement that it pay demurrage to other ships. Consequently, the "interference is an item of damages resulting from [the] other tort." Id. The tortious activity complained of is not the interference with contracts but the blockage of the dock.
 
 
 75
 Clearly, the instant case does not present the potential of an unending chain of liability. It is not the owners of the delayed vessels who are bringing suit. Their claims would fall within the ambit of the Robins prohibition. The instant suit presents only the owner of the injured property and the alleged tortfeasor. The measure of damages (money paid out) does not affect the nature of the injury and ought not preclude the imposition of liability.
 
 
 76
 The application of the bright line rule precluding recovery for economic loss absent physical injury is not necessary given the ability of the courts to utilize traditional limits on tort liability. Indeed, the district court expressed doubts about appellant's capacity to fulfill these traditional requirements. See Getty, 595 F.Supp. at 455 & nn. 2-3, 456. As explained above, the rule also is inequitable to the extent that appellant's neighbor, had appellee physically damaged the neighbor's pier, would be allowed to recover whereas appellant would be precluded from recovering. This court should reject the path taken by the Fifth and Eleventh Circuits in favor of traditional tort law.
 
 III
 
 77
 Litigation of the instant suit is not prohibited by the Robins mandate. The plaintiff at bar is the owner of the allegedly injured pier and not a third-party related to the tort only by contract.
 
 
 78
 Adoption of a bright line rule precluding liability for negligence which results only in economic loss is unwarranted. The use of traditional tort principles limiting liability would result in a more equitable approach, especially in the narrow factual context of this case. The courts have the capacity to apply these traditional principles and do so on a daily basis.
 
 
 79
 Consequently, I respectfully dissent from the majority's opinion. I would find error in the district court's conclusion that Robins bars recovery, and I would reverse and remand the case for consideration under traditional concepts of tort law.
 
 
 
 *
 Honorable Carol Los Mansmann, formerly of the United States District Court for the Western District of Pennsylvania, now on this court, sitting by designation
 
 
 [1]
 The vessels were scheduled to dock, and actually did dock, as follows: INTREPID, 1600 January 12, 1981-0510 January 14, 1981; OGDEN CHAMPION, 0800 January 14, 1981-0930 January 15, 1981; INTERSTATE 140, 1400 January 13, 1981-0810 January 17, 1981; ALABAMA GETTY, 2100 January 14, 1981-0155 January 20, 1981; TEXAS GETTY, 2200 January 15, 1981-0110 January 18, 1981; PENNSYLVANIA GETTY, 2300 January 16, 1981-1635 January 23, 1981; INTERSTATE 32, 2300 January 12, 1981 (diverted to another terminal); SOLVEIG, 0245 January 21, 1981-1820 January 25, 1981
 
 
 [2]
 Rule 41(b) provides, in relevant part:
 After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a).
 
 
 [3]
 See, e.g., In Re Kinsman Transit Co. (Kinsman II), 388 F.2d 821 (2d Cir.1968)
 
 
 [4]
 See also Carpenter, Interference with Contractual Relations, 41 Harv.L.Rev. 728 (1928); Green, Relational Interests, 29 Ill.L.Rev. 1041 (1934-35), 30 Ill.L.Rev. 1, 2 (1935-36); Harper, Interference with Contractual Relations, 47 Nw.U.L.Rev. 873 (1953); James, Limitations on Liability for Economic Loss Caused by Negligence: A Pragmatic Appraisal, 25 Vand.L.Rev. 43 (1972)
 
 
 [5]
 Obviously unsatisfied with where the bright line has been placed, the Second Circuit has attempted to create a new rule. In Petition of Kinsman Transit Co., 388 F.2d 821 (2d Cir.1968) (Kinsman II ), the court was willing to depart from Robins and rely on a case-by-case application of proximate cause principles rather than the blanket bar. We unhesitatingly reject such an approach because it replaces a time-tested rule that sets out the law clearly and distinctly with what is in fact no rule at all. We embrace what Judge Gee of the Fifth Circuit stated in M/V TESTBANK:
 The compensatory bucket may well be emptied by ... damages and expenses of litigation long before remote members are even in a position to line up for a compensatory drink. Even considering compensatory damages alone for early claimants, compassionate juries--keenly aware that large percentages of any awards that they make will go for individuals' attorneys' fees and other expenses of litigation--will likely insure that little of the limited pot will remain to succor late comers.
 M/V TESTBANK, 752 F.2d at 1033 (Gee, J., concurring).
 
 
 [6]
 See M/V TESTBANK, 752 F.2d 1019; Akron Corp. v. M/T CANTIGNY, 706 F.2d 151 (5th Cir.), reh'g denied, 711 F.2d 1054 (5th Cir.1983); Hercules Carrier, Inc. v. Florida, 720 F.2d 1201 (11th Cir.1983), reh'g denied, 728 F.2d 1359 (11th Cir.1984); Kingston Shipping Co. v. Roberts, 667 F.2d 34 (11th Cir.), cert. denied, 458 U.S. 1108, 102 S.Ct. 3487, 73 L.Ed.2d 1369 (1982); In re Bethlehem Steel Corp., 631 F.2d 441 (6th Cir.1980), cert. denied, 450 U.S. 921, 101 S.Ct. 1370, 67 L.Ed.2d 349 (1981); Dick Meyer Towing Service, Inc. v. United States, 577 F.2d 1023 (5th Cir.1978), cert. denied, 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979); In re S.C. Loveland Co., 170 F.Supp. 786 (E.D.Pa.1959)
 
 
 [7]
 In its complaint, appellant alleged:
 
 
 [6]
 On or about January 12, 1981 the MT FADI B did berth at plaintiff's Delaware City Terminal to discharge a cargo of crude oil
 
 
 [7]
 During the aforesaid discharge operation, the MT FADI B developed a crack in her hull, causing the discharge of the cargo to be substantially delayed
 
 
 [8]
 The aforesaid crack was sustained as a result of the unseaworthiness of the MT FADI B and/or the negligence of her officers and crew
 
 
 [9]
 As a result of the delay, plaintiff was deprived of the use of its terminal berth for a substantial period of time and was unable to accommodate at its terminal, as scheduled, several other vessels which were, as a result, then compelled to wait at anchorage pending the removal of the FADI B. Further, plaintiff was denied access to the navigable water of the Delaware River
 
 
 [10]
 Plaintiff, as a result of defendants' actions has incurred demurrage charges and other damages presently estimated to be in excess of $600,000
 App. at 8-9.